HELEN BUTLER, PLAINTIFF-RESPONDENT, v. ACME MARKETS, INC., DEFENDANT-APPELLANT.

Argued November 30, 1981—Decided May 11, 1982.

*Daniel K. Newman* argued the cause for appellant (*Pantages, Sellar, Richardson, Stuart & Crowley*, attorneys).

*Francis F. Welsh* argued the cause for respondent.

*Henry G. Morgan* submitted a brief on behalf of *amici curiae* Supermarkets General Corp., Vornado, Inc., and New Jersey Catalog Showroom Merchants Association (*Morgan, Melhuish, Monaghan & Spielvogel*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

The central question in this appeal is the extent of a store owner's duty to protect its customers against the criminal acts of third persons. The trial court set aside a jury verdict of damages, holding that there was no such duty. The Appellate Division reversed. 177 *N.J.Super.* 279 (1981). We granted defendant's petition for certification, 87 *N.J.* 414 (1981), and we now affirm.

## I.

On the evening of November 11, 1977, plaintiff Helen Butler, then in her early sixties, went out to shop for food at an Acme store located in Montclair. Having parked on the easterly side of the store's parking lot, Mrs. Butler came out with her bags, set them down on the bumper of her car, and began to open her trunk. Suddenly, someone came up from behind, knocked her to the ground, and grabbed her purse. In the fall, she injured her head, face and chest and twisted her ankle. Remaining conscious, she was able to assist the police in apprehending her attacker.

Mrs. Butler sued Acme Markets, Inc. to recover for her personal injuries and lost wages, claiming that Acme had been negligent in failing to warn and in failing to provide a safe place in which to shop and park. The area where the assault occurred was well lighted. Seven muggings had occurred on the Acme premises in a year's time, five of which occurred in the evenings during the four months preceding the attack on Mrs. Butler. Although Mrs. Butler lived several blocks from the store, and had shopped there for a number of years, she was unaware of the previous muggings on the premises. Acme had hired off-duty Montclair police officers to supply security for the Acme Market on certain evenings. However, only one officer was on duty at a time. The guard's duties were to watch out for shoplifters, to see that no bad checks were passed, to patrol both inside and outside of the store, and to watch customers' parcels

while they retrieved their cars. No signs or warnings advising the patrons of the possibility of criminal attack were posted. At the time Mrs. Butler was attacked, the lone security guard was inside the store; there was no one on duty in the parking lot.

At the close of the plaintiff's case and again at the close of the entire trial, the defendant moved to dismiss the complaint for failure to state a claim. The trial court reserved decision pursuant to R. 4:40–2(a). The jury returned a verdict of $3600 for the plaintiff. It found that Acme had not exercised reasonable care, but that Acme "did not cause the crime." The trial court molded the verdict in the plaintiff's favor; the jury assented unanimously. Thereafter, the trial judge granted the defendant's motion for judgment notwithstanding the verdict and entered judgment in favor of the defendant.

The Appellate Division reversed the trial court. That court said:

> The duty owed by the proprietor of premises to which the public is invited for consummation of business with the proprietor, such as the operator of a supermarket, is to exercise reasonable care to see that one who enters his premises upon that invitation has a reasonably safe place to do that which is within the scope of the invitation.... In our view, it is not unreasonable or unfair to require defendant and other supermarket operators furnishing parking facilities to their customers in high crime areas or where, as here, there has been a history of persistent attacks, to provide adequate protection, such as security guards, for its customers using the parking facilities. [177 N.J.Super. at 286–287 (citations omitted)]

## II.

As the Appellate Division correctly recognized, a shopkeeper's liability under these circumstances is properly based upon familiar negligence concepts. The proprietor of premises to which the public is invited for business purposes of the proprietor owes a duty of reasonable care to those who enter the premises upon that invitation to provide a reasonably safe place to do that which is within the scope of the invitation. *Brody v. Albert Lifson & Sons*, 17 N.J. 383, 389 (1955); *Genovay v. Fox*, 50 N.J.Super. 538, 549 (App.Div.1958), rev'd on other grounds, 29 N.J. 436 (1959). The measure of that care has been described as

"due care under all the circumstances." *Bozza v. Vornado, Inc.,* 42 *N.J.* 355, 359 (1964); 2 *Harper & James, Law of Torts* (1956) § 27.12 at 1487. "Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others." *Rappaport v. Nichols,* 31 *N.J.* 188, 201 (1959). If the reasonably prudent person would foresee danger resulting from another's voluntary criminal acts, the fact that another's actions are beyond defendant's control does not preclude liability. *Trentacost v. Brussel,* 82 *N.J.* 214, 222 (1980); *Hill v. Yaskin,* 75 *N.J.* 139, 143–145 (1977); *Zinck v. Whelan,* 120 *N.J.Super.* 432, 445; *Picco v. Fords Diner, Inc.,* 113 *N.J.Super.* 465 (1971); *Genovay v. Fox, supra,* 50 *N.J.Super.* at 550–551. Foreseeability of the risk that criminal acts of others would cause harm is the crucial factor. *McGlynn v. Newark Parking Authority,* 86 *N.J.* 551 (1981).

Application of these principles in *Braitman v. Overlook Terrace Corp.,* 68 *N.J.* 368 (1975), led to the imposition of liability for a landlord's failure to provide an adequate lock on an apartment door, resulting in a property loss due to a robbery. Since the robbery was within the scope of foreseeable risks created by the inadequate security, the Court found the landlord liable for negligence.

In *Trentacost v. Brussel, supra,* this principle of responsibility to provide adequate security against foreseeable conduct was applied to the imposition of liability for personal injuries to a tenant who was assaulted while on the stairway of her apartment. There was no lock on the front door and there was ample evidence that criminal activity affecting the building was reasonably foreseeable.

While those cases involved the relationship of landlord and tenant, their principles are equally applicable to the responsibility of commercial shopkeepers. The common law traditionally imposed affirmative duties only on selected individuals based on their status. The courts were reluctant to force people to help

one another.[1] Liability for nonfeasance developed slowly appearing first in the case of those engaged in public calling, such as common carriers, innkeepers, public warehousemen and public utilities. Owners and occupiers of land make up the largest single group upon whom the duty of affirmative conduct has been imposed. *Prosser, Law of Torts* (4th ed.), § 56, at 339. The historical classifications of the degrees of care owing to visitors upon land are undergoing gradual change in the law in favor of a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others. *Renz v. Penn Central Corp.*, 87 *N.J.* 437, 462 (1981); *McGlynn, supra,* 86 *N.J.* at 555–560.

### III.

██ Since the foreseeability of criminal conduct in this case is apparent, defendant argues that the conventional principles of proximate cause should not apply here because the responsibility for security remains in the governmental sector with its attendant police power. A legal realist will concede that "[u]tilization of that term [proximate cause] to draw judicial lines beyond which liability will not be extended is fundamentally as an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, 'foreseeability' and 'natural and probable consequences.'" *Caputzal v. The Lindsay Co.*, 48 *N.J.* 69, 77 (1966). Defendant's principal reliance is upon *Goldberg v. Housing Auth. of Newark*, 38 *N.J.* 578 (1962), where it was said:

---

[1]Thus the general rule:

There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection. [*Restatement (Second) of Torts,* § 315 at 122 (1965) ]

> The question whether a private party must provide protection for another is not solved merely by recourse to "foreseeability." Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide "police" protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner. . . . Of course, none of this is at all palatable. [*Id.* at 583]

Plaintiff in *Goldberg* was beaten and robbed by two men while he was delivering milk to the defendant's housing project. The jury found for plaintiff and the Appellate Division affirmed. Before the Supreme Court, plaintiff's sole thesis was that the defendant housing authority had a duty to provide police protection. By a 4–3 decision, the Court concluded that as an original proposition the owner of multi-family structures did not have the duty to provide police protection.[2] Helen Butler's case did not proceed solely on the basis that Acme must provide police protection. The case was presented to the jury and decided by it in terms of general negligence, including failure of the duty to warn patrons of the recent repeated attacks.

But on the thesis it pursued, the *Goldberg* court assigned three reasons for its conclusion: (1) that police work was specialized and there was no room for the private devices to operate in the field; (2) that the imposition of the cost of the security upon the tenants was unfair, and (3) the inevitable vagueness of the proposed duty. 38 *N.J.* at 589–91.

As to the first point, it is not decisive here for two reasons: the store was in fact furnishing security through the services of the community's trained police officers in their off-duty status. Their skills and training had been previously provided by government. In addition, trained private security services have now become widespread. They are regulated by state statute.

---

[2] Justice Jacobs in dissent observed that Harry Goldberg had not really claimed that the Housing Authority must create its own police force, but at least should have provided a doorman or lock on the doors. *Goldberg, supra,* 38 *N.J.* at 607.

*N.J.S.A.* 45:19–8 *et seq.* We do not endorse or encourage an untrained response to the problem.

With respect to the allocation of costs issue, in the modern context of merchandising, our placement of these costs is consistent with the principles of the common law. Just as it is deemed fair for the owners and therefore indirectly the tenants of an apartment building, *Braitman, supra*, or the operators and patrons of a parking lot, *McGlynn, supra*, to bear the costs of avoiding negligence, it is fair that the costs of negligent failure to protect against crime be similarly borne by the operators and indirectly patrons of such shopping facilities.

The remaining concern in *Goldberg* with respect to vagueness of the duty remains genuinely valid. It is concededly difficult to articulate what measures, in the words of Chief Justice Weintraub, will protect against "the thug, the narcotic addict, the degenerate, the psychopath and the psychotic." *Goldberg, supra*, 38 *N.J.* at 589. But, as Justice Jacobs points out in the dissent, it is no easier to know how many ushers or guards would suffice at a skating rink or railroad platform to deal with the crush of a crowd. He said:

> The defendant's duty was to take reasonable precautions; that duty was no more vague than is the test of reasonableness throughout our law generally.... Justice Holmes noted that even in the field of criminal law a test comparable to reasonableness may be applied without infringing any principles of fairness or due process. [*Goldberg, supra*, 38 *N.J.* at 605–06 (Jacobs, J., dissenting) (citations omitted)].

The much cited decision of *Kline v. 1500 Massachusetts Ave. Apt. Corp.*, 439 *F.*2d 477 (D.C.Cir.1970), observed that the *Goldberg* Court seemed to use the word *foreseeable* interchangeably with *possible*, and agreed that it would be folly to impose liability for mere possibilities. "But we must reach the question of liability for attacks in the sense that they are probable and predictable." *Kline, supra*, 439 *F.*2d at 483.

Certainly, then, we do not intend an absolute obligation to prevent all crime. Since police protection cannot provide assurance against all criminal attacks, it is inevitable that crimes will

be committed notwithstanding the sufficiency of the force. The *Restatement (Second) of Torts*, § 344 at 223–224 (1965) sets forth the duty owed by a store owner to protect his invitees from the acts of third persons as follows:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

One comment to the section provides:

Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of the third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection. [*Restatement (Second) of Torts*, § 344 at 225–226, Comment (f) (1965)]

Thus under both *Restatement, (Second) of Torts*, § 344, *supra*, and the prior decisions of this Court, it was for the jury to determine if Acme exercised reasonable care in the performance of its duty to safeguard its business invitees from the criminal acts of third persons. Here, it was at least reasonable for the jury to determine that absent warnings, hiring one guard who primarily remained inside the store was an insufficient response in light of the known, repeated history of attacks on the premises.

Holding the existence of a duty to take reasonable precautions to protect certain classes of victims from criminal attack is no new departure. *Braitman, supra; Trentacost, supra; Yaskin, supra,* and *McGlynn, supra,* are consistent. Our lower courts have already applied these principles. In *Picco v. Fords Diner, Inc., supra,* 113 *N.J.Super.* at 467–468, Justice Sullivan (then a presiding judge of the Appellate Division) held that the owner

of a diner had the duty to protect its patrons against criminal assault. In *Genovay v. Fox, supra,* 50 *N.J.Super.* at 554–555, Judge Conford wrote that while a duty to protect a bowling alley patron from criminal attack might be found in a proper case, there was insufficient proof of knowledge of any likelihood of such an occurrence to raise a jury question on the existence of the duty. Outside of New Jersey, as early as 1947, the United States Supreme Court held a railroad liable for failure to make reasonable provision against criminal assault upon a young woman telegraph operator. *Lillie v. Thompson,* 332 *U.S.* 459, 68 *S.Ct.* 140, 92 *L.Ed.* 73 (1947). The New York Court of Appeals recently reaffirmed its imposition of a real property owner's duty to protect against foreseeable criminal attacks on his premises but exempted the New York City Transit Authority (which performs a governmental function) because no liability arises from the allocation of police resources, a legislative-executive decision free from judicial interference. *Weiner v. Metropolitan Transportation Auth.,* 55 *N.Y.*2d 175, 448 *N.Y.S.*2d 141, 433 *N.E.*2d 124 (1982).

## IV.

We are conscious that not all courts or commentators agree that such a duty should be imposed.[3] *Cook v. Safeway Stores,*

---

[3]Concern over compensation of crime victims has taken many forms. New Jersey provides limited compensation for such victims under the Criminal Injuries Compensation Act of 1971, *N.J.S.A.* 52:4B–1 *et seq.* Such a public response need not displace other available civic remedies. The National Advisory Commission on Criminal Justice Standards and Goals, Community Crime Prevention 196 (1977) stressed the need for business management for crime prevention. See *Bazyler, The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Protect Patrons from Continued Attack,* 21 *Ariz.L.Rev.* 727, 730 n. 14 (1979). The National Advisory Commission concludes that

[l]aw enforcement is not a game of cops and robbers in which the citizens play the trees. Unfortunately, there are still too many trees. If crime reduction is to become anything more than wishful thinking, citizens

*Inc.*, 354 *A.*2d 507 (D.C.Ct.App.1976); *Cornpropst v. Sloan*, 528 *S.W.*2d 188, 197 (S.Ct.Tenn.1975); *Shipes v. Piggly Wiggly St. Andrews, Inc.*, 269 *S.C.* 479, 238 *S.E.*2d 167 (S.Ct.S.C.1977); Henszey and Weisman, *What is the Landlord's Responsibility for Criminal Acts Committed on the Premises?*, 6 *R.E.Law J.* 104 (1977) (agreeing that there is a need to resolve the question but suggesting that it be left to the Legislature). See 10 *A.L.R.*3d 619 (1966). Others have urged that courts extend the duty to commercial lessors. Bazyler, *The Duty to Provide Adequate Protection: Landowners' Liability for Failure to Protect Patrons from Criminal Attack*, 21 *Ariz.L.Rev.* 727 (1979). See also Note, *Landowner Owes Invitee No Duty to Provide Police Protection Against Criminal Attack*, 63 *Colum.L.Rev.* 766 (1963); Note, *Landlord Has Duty to Take Reasonable Precautions to Protect His Tenants Against Criminal Acts of Third Parties*, 45 *N.Y.U.L.Rev.* 943 (1970). All recognize the serious concern that this new burden may place upon already hard pressed businessmen. Still there remains sufficient flexibility in the standard of reasonable care applied for juries to avoid harshness through the application of "common sense" in following the court's charge. *Smith v. Arbaugh's Restaurant, Inc.*, 469 *F.*2d 97, 106 (D.C.Cir. 1972), *cert.* den., 412 *U.S.* 939, 93 *S.Ct.* 2774, 37 *L.Ed.*2d 399 (1973).

## V.

■ Other points raised are whether the trial court erred in molding the verdict and whether expert opinion evidence is

---

must care enough to devote energy, money, and—most of all—themselves to the fight for positive results...."

The article's author points out that

[i]nvolvement of owners of private businesses in crime reduction is especially necessary. As the holders of economic power in this country, private businesses are in a key position to help reduce the rate of crime. Involvement of those citizens who hold the greatest amount of economic power and influence, necessarily should produce the greatest positive effect. [*Id.* at 750, n. 151]

required to prove negligence here. As to the first, we are satisfied that the verdict was correctly molded "in consonance with the plainly manifested intention of the jury..." *Turon v. J. & L. Construction Co.*, 8 *N.J.* 543, 552 (1952). In essence the judge permitted the jury to mold its own verdict by molding it in their presence before discharge and obtaining their concurrence. *Gilday v. Hauchwit*, 91 *N.J.Super.* 233 (App.Div.1966), rev'd on other grounds, 48 *N.J.* 557 (1967).

 As to the absence of expert testimony, except for malpractice cases, there is no general rule or policy *requiring* expert testimony as to the standard of care. 2 *Harper & James, Law of Torts* (1956), § 17.1, at 966; *Cramer v. Theda Clark Memorial Hospital*, 45 *Wis.2d* 147, 172 *N.W.2d* 427 (1969); *Phillips v. Delaware Power & Light Company*, 216 *A.2d* 281 (S.Ct. Del.1966). *Cf. Berger v. Shapiro*, 30 *N.J.* 89 (1959) (whether missing brick in the top step of porch constituted negligence, held for jury). Even in malpractice cases, the facts of a given case may be such that the common knowledge possessed by laymen may permit a finding that a duty of due care has been breached. *Klimko v. Rose*, 84 *N.J.* 496, 503–504 (1980). The test of need of expert testimony is whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid judgment as to whether the conduct of the party was reasonable. 2 *Harper & James, Law of Torts, supra*, at 966. Conversely, the test of admissibility is

> not whether the subject matter is common or uncommon or whether many persons or few have knowledge of the matter; but it is whether the witnesses offered as experts have peculiar knowledge or experience not common to the world which renders their opinions founded on such knowledge or experience any aid to the court or jury in determining the questions at issue. [*Rempfer v. Deerfield Packing Corp.* 4 *N.J.* 135, 141–142 (1950)]

Obviously, such testimony would be an aid to a jury and its use is encouraged in future cases. But its absence is not fatal. The jury's finding on the reasonableness of defendant's behavior was one where "fair minded men may honestly differ as to the conclusion to be drawn from disputed facts" and was properly

submitted to the jury. *Brody, supra*, 17 *N.J.* at 391; *Lipton v. Dreamland Park Co.*, 121 *N.J.L.* 554 (E. & A. 1939).

In the last analysis then:

Whether a duty exists is ultimately a question of fairness. The inquiry involves weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. [*Goldberg v. Housing Authority, supra*, 38 *N.J.* at 583]

Here, because the business invitor is in the best position to provide either warnings or adequate protection for its patrons when the risk of injury is prevalent under certain conditions, and because the public interest lies in providing a reasonably safe place for a patron to shop, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER, POLLOCK and O'HERN—6.

*For reversal*—None.