CURRIER, J.A.D.
*15 In this breach of contract action arising out of a purchase agreement between the parties, the trial judge found, after a Rule *180 104 hearing, that the testimony of plaintiff's principal witness was *16 insufficient to sustain its claim and plaintiff required an expert to establish its proofs. As a result, the judge dismissed plaintiff's complaint and, after a bench trial, entered judgment for defendant on its counterclaim. Because we conclude that the trial judge erroneously precluded plaintiff's witness from presenting proofs of its claims and required it to produce an expert, we reverse and remand for a new trial.
I.
Plaintiff E & H Steel Corporation was the successful bidder for a proposal to fabricate sixteen types of structural steel items to be used for equipment in a power station owned and operated by defendant PSEG Fossil.[1] Plaintiff based its unit prices on documents and specifications submitted with the bid package. Following the award of the bid, the parties met to execute the contract. After the execution of the agreement, defendant's representatives placed a CD in the contract binder containing the drawings for the required steel components.
Plaintiff alleged that the CD contained forty-seven new drawings not previously provided to the company that differed significantly from the drawings supplied in the bid package, upon which the contract price was based. There were also numerous revisions to the drawings previously priced. Defendant denied plaintiff's requests for a revision and re-pricing of the units, and a conformity of the contract to the new drawings.
Nevertheless, plaintiff fabricated the steel according to the new drawings and submitted change orders for its increased time and labor needed to construct the steel in conformity with the drawings. Defendant contended that the contract only permitted *17 change orders for increased tonnage, and not for expenses of more time and labor. Accordingly, it issued a change order increasing the tonnage amount of the contract but refused additional change order requests.
Plaintiff filed a construction lien and a complaint alleging that defendant breached the contract when it presented new drawings which required additional time and labor than that previously provided for in the bid drawings and purchase agreement, and failed to approve change order requests necessitated by the additional drawings. Defendant's counterclaim also alleged breach of contract, asserting that the contract only permitted change orders for increased tonnage, not additional time and labor. The counterclaim also sought the discharge of the construction lien.
A.
Defendant moved for summary judgment, arguing that the complaint was filed after the expiration of the one-year statute of limitations period specified under the contract and requesting the discharge of the construction lien. The motion was denied on November 18, 2011.[2] A second motion to discharge the construction lien was denied in a September 4, 2013 written order.
*181 Summary judgment was again sought by defendant on several grounds, including the statute of limitations, and was denied on May 15, 2015. Defendant moved for reconsideration of the denial of its summary judgment motion and requested a Rule 104 hearing for a determination as to whether expert testimony was required for plaintiff to establish its claims. Although plaintiff's principal witness, Scott Quattlebaum, had answered extensive interrogatories and been deposed, he had not been designated as an expert.
*18 Defendant's motion for reconsideration was denied on June 15, 2015. However, the court agreed to conduct a Rule 104 hearing to determine whether plaintiff required an expert to establish a prima facie case.
B.
At the Rule 104 hearing, Quattlebaum, a vice-president of the company and a licensed professional engineer, testified that he had worked for the company since 1987 in numerous roles including as a general laborer, fabrication employee, and shop employee, "doing the fabrication processes starting from the very beginning ... all the way through the completed project." He worked in the engineering and detailing department for several years drafting fabrication or "shop" and erection drawings from engineering or construction drawings.
Quattlebaum continued to work for plaintiff as assistant engineering manager[3] and, later, engineering manager. In that role, he was in charge of the engineering and detailing departments. He had offices in two different states, overseeing thirty-five people who detailed or created shop and erection drawings, compared the shop and erection drawings for revisions, and compared the contract drawings to determine change order requests.
Defendant put out a bid inquiry for a Selective Catalytic Reduction Unit-a component of emission control equipment-to be installed at its power plant. Quattlebaum explained the specifications of the proposal, the request for pricing of sixteen items including seven categories of structural steel, and the requirements that the bid comply with the included CD of drawings. He also detailed for the court what certain terms meant and their importance. He advised that he reviewed all of the contract *19 drawings and specifications for the project and created a budget of engineering and detailing.
Referring to the bid documents for the specifications for connections and bolts, Quattlebaum offered an extensive explanation of the different factors that he considered in calculating the bid price for those elements. He noted the importance of determining what code governed the project because the particular code standards had to be taken into account in detailing fabrication and delivery of the steel parts. He also used drawings and photographs to supplement and support his testimony.
In discussing the events surrounding the signing of the contract, Quattlebaum stated that upon opening the CD provided to his team as they left the signing, he discovered there were forty-seven new drawings not previously provided to his company that differed significantly from the drawings supplied in the bid package, upon which the contract price was based. There were also numerous revisions to the drawings previously priced. He noted particularly the change in connection details. Whereas the original drawings showed connections to be 10% of the overall weight *182 of the unit, the new drawings increased the connections to 34% of the total weight for the same length of beam. He described this as "a dramatic increase in the quantity of connection material, which is the most expensive commodity on this piece." He added that as more connections are added to each foot of steel beam, "the higher the man hour per foot it costs" to produce that beam.
As compared to the original set of drawings, Quattlebaum stated that the steel members shown in the new drawings were "very large and very heavy, requiring the use of more and larger bolts and cranes to lift the pieces." This required the revision and re-pricing of the units and unit prices in the contract.
As an example, Quattlebaum showed the court photographs of the connection plate that the bid drawings and specifications required, and the connection plate that plaintiff eventually fabricated and shipped to the site. In the photographs, the templates are placed on either side of a man, demonstrating the significant *20 difference in the size of the two connections. Numerous other photographs and drawings were used to show the difference between the size of pieces specified in the bid and the much larger "as built[,]" or fabricated pieces constructed pursuant to the additional CD drawings.
Quattlebaum also explained how the change in drawings affected the fabrication process and pricing scheme. For instance, the original size of the pieces specified in the bid were small enough to fit into plaintiff's automated equipment, but some of the "as built" pieces were too large to do that. They "ha[d] to be hand cut with a torch." In addition, plaintiff's machinery was equipped to punch the seven-eighths inch holes shown on the inquiry specifications, but when the sizing was increased to 72 one-and-a-quarter inch holes on the connections shown on the new drawings, each hole had to be hand drilled. The time to hand drill the holes compared to punching them was significant.
In short, Quattlebaum stated that the increase in the amount of connection material required by the new drawings necessitated a proportionate increase in the man-hour rate because of the amount and size of the detailed material that had been added and the fact that it could no longer be fabricated in the automated machinery. In requiring man-hours instead of automated machinery use, the supplemental drawings increased the complexity for the work.
Quattlebaum also described to the court his preparation of some of the change order requests presented to defendant based on the increased tonnage, mix,[4] and complexity specified in the new drawings. He used a power point presentation to demonstrate his analysis of each change order request. Finally, he explained to the *21 court the response and payment, if any, plaintiff had received from defendant on the change orders.
C.
After two days of testimony from Quattlebaum, defendant moved for judgment under Rules 4:37-2(b) and 4:40-1.[5] Counsel *183 argued that the engineer was not designated as an expert witness, yet all of his testimony was expert opinion. Plaintiff countered that an expert was not necessary in this breach of contract case, and that Quattlebaum was personally involved in the contract process and performance, making his testimony factual and not an opinion.
On June 16, 2015, the judge issued an oral decision granting defendant's motion for an involuntary dismissal. He described Quattlebaum's testimony as "very technical, extremely arcane, very detailed[,] and something that the jury would have to hear in order to understand the difference in the plans." The judge determined that, because of its technical nature, the testimony was expert testimony. As plaintiff had not designated Quattlebaum as an expert, and he was the only witness proffered to support plaintiff's claims, the judge concluded that plaintiff could not prove a prima facie case as to any of its causes of action. As a result, plaintiff's claims were dismissed.
Following the ruling, plaintiff moved to amend its interrogatories to designate Quattlebaum as an expert and asked for a day to present briefs on the issue. The next day plaintiff proffered an expert report from Quattlebaum, contending that everything contained in the report had already been disclosed, and was identical *22 to the information previously provided in interrogatory answers, deposition, and Rule 104 testimony.
The judge denied the motion, finding a lack of "extraordinary circumstances" to permit the late designation of Quattlebaum as an expert. He determined, without specificity, that defendant's "posture" and "counterclaim" would have been different if Quattlebaum had been named as an expert.
D.
A bench trial proceeded on defendant's counterclaim for breach of contract and dismissal of the construction lien. Plaintiff moved to amend its answer to the counterclaim to assert a claim for set-off. It intended to present Ray Vinson, its expert on damages, and Quattlebaum to testify regarding amounts owed under the change orders. The judge found that Quattlebaum could testify as to the money owed under the contract but precluded him from providing a "foundation for [his] belief," deeming it inadmissible expert testimony.
Defendant presented several witnesses to support its counterclaim, including an expert witness with a degree in civil engineering and experience in steel fabrication. The expert opined that there were no changes between the bid documents and what plaintiff actually built. Therefore, plaintiff's change orders had "overstated" the amount due such that plaintiff was not entitled to the additional monies paid through the change orders.
The court restricted the scope of Quattlebaum's testimony. He was prevented from describing his role in the bidding process and explaining the terms of plaintiff's bid because the judge ruled that it was impermissible expert testimony. He similarly was not permitted to interpret or analyze the drawings, or describe them in a way the court deemed "technical." The court also restricted Quattlebaum's descriptions of plaintiff's fabrication process when he attempted to use photographs and a video of plaintiff's plant as expert testimony.
*184 *23 Quattlebaum said plaintiff fabricated the steel according to the construction drawings on the CD and all the drawings that came afterwards. But he was not permitted to explain the differences between the sets of drawings. Nor could he present any testimony regarding the pricing of connections or even describe what connections were.
Quattlebaum was permitted to explain what was shown on all of the bills of lading, invoices, and payment schedules. He described the change order requests, the construction lien, and his belief that they were made in good faith; however, he was not permitted to explain the reasons for the change orders.
Because of the exclusion of Quattlebaum's testimony, defendant moved to bar plaintiff's damages expert, Vinson, because he was not an engineer and could not provide the proper basis for a set-off or recoupment claim. The judge agreed, stating that without Quattlebaum's testimony to explain the differences in the sets of drawings, Vinson could not testify regarding the alleged damages.
On November 16, 2015, the court issued a written decision, rejecting most of the damages requested in defendant's counterclaim. The judge termed defendant's claim that it was entitled to recover monies paid in a change order as an "absurd and last minute claim." He placed "no credibility in any portion" of defendant's expert testimony, noting that some of the photographs the expert used "might have been misleading." In contrast, the judge found Quattlebaum's testimony offered on the specific change order more credible, noting his methodology was more accurate.
In addressing defendant's breach of contract claim, the court rejected defendant's arguments that the contract did not allow for change orders for additional bolts, a revised mix, or refabricated material. The court said it was undisputed that a new CD was provided to plaintiff after the contract was signed. The court found plaintiff's assertions that it had not anticipated so many additional drawings with added complexity credible, adding there were no proofs that plaintiff was aware "that the CD drawings would be so radically different" from the bid drawings.
*24 The judge concluded that defendant failed to prove any breach of contract by plaintiff "regarding anything that was a result of the subsequently submitted CD drawings." Defendant only prevailed on one claim-a columns splice back charge for $345,890.[6] Plaintiff's claims for recoupment and set-off were denied because plaintiff lacked the requisite expert testimony, due to the exclusion of Quattlebaum and Vinson, required to prove the basis for the alleged increased and actual costs.
Lastly, the court discharged plaintiff's construction lien based on the earlier dismissal of the complaint. Defendant's claim for attorney's fees on the construction lien was denied as the judge found plaintiff had not proceeded in bad faith. He stated that plaintiff's "affirmative claim and the construction liens" arising from the CD drawings and their added complexity, "were based on a written contract" and "clearly based on a good faith dispute and not a willful overstatement or exaggeration."
II.
On appeal, plaintiff argues the judge erred in precluding Quattlebaum's testimony. As a result, plaintiff seeks the reversal of the dismissal of the complaint and construction lien, and the judgment on the counterclaim. Defendant cross-appeals from the denial of its motion to dismiss the *185 complaint, on statute of limitation grounds, and the denial of summary judgment. Defendant also asserts that the court erred in denying it attorney's fees on the construction lien.
A.
A trial court's decision to admit or exclude evidence generally is entitled to deference absent a showing that the court abused its discretion such that the decision was so wide off the mark as to constitute a manifest injustice.
*25 Griffin v. City of E. Orange, 225 N.J. 400, 413, 139 A.3d 16 (2016). However, no deference is accorded when the court fails to properly analyze the admissibility of the proffered evidence. Konop v. Rosen, 425 N.J. Super. 391, 401, 41 A.3d 773 (App. Div. 2012). Here, the trial court misconstrued the nature of Quattlebaum's testimony and misapplied the pertinent rules of evidence. The resulting determination to exclude the testimony was an abuse of discretion.
Three different evidentiary rules establish the predicates for admission of factual testimony, lay opinion testimony, and expert testimony. N.J.R.E. 602 ; N.J.R.E. 701 ; N.J.R.E. 702. The eligibility requirements for factual testimony are set forth in N.J.R.E. 602, which provides that, except for opinion testimony offered by an expert, "a witness may not testify to a matter unless ... the witness has personal knowledge of the matter." Testimony in the form of opinion or inferences from a witness who is not testifying as an expert also "may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. The admissibility of lay opinion testimony pursuant to N.J.R.E. 701 derives from that rule's incorporation of N.J.R.E. 602's limitations, such that the foundation of the witness's opinion must be his or her personal knowledge of the matter. See Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 403 (3d Cir. 1980) (discussing analogous F.R.E. 602 and 701 ).
But expert testimony is untethered to the constraints of personal knowledge and perception imposed by these rules. An expert may base an opinion or inferences on facts or data that are perceived by the expert or that are made known to the expert at or before the hearing. N.J.R.E. 703. Moreover, if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," they need not even be admissible in evidence. Ibid. Admissibility of expert testimony is governed by N.J.R.E. 702 : "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a *26 witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."
Here, the trial court determined that Quattlebaum's evidence was expert testimony because it was technical, arcane, and involved specialized knowledge. Although the judge's assessment of Quattlebaum's testimony was accurate, the nature of the testimony did not transform the engineer into an expert witness. Quattlebaum provided factual information based on his own involvement in the project and observations of the process. He described the differences between the bid drawings and the CD drawings as well as the impact the differences caused to the contract pricing. His testimony supported plaintiff's claim that defendant's refusal to pay for the change in the orders was a breach of the contract.
Contrary to the trial court's interpretation of the expert opinion rule, New *186 Jersey law does not mandate that lay testimony, and even lay opinion testimony, based on scientific, technical, or other specialized knowledge, automatically triggers the need for compliance with the rules for admissibility of expert testimony. The fact that a person with personal knowledge of facts relevant to a dispute may also qualify as an expert in the particular field associated with those facts does not convert his or her testimony based on personal knowledge of specific facts into expert testimony under N.J.R.E. 702 and 703. State v. Sparano, 249 N.J. Super. 411, 422, 592 A.2d 608 (App. Div. 1991) (reasoning that a witness's description of "the process of manufacturing methamphetamine and the street price of the final product did not constitute 'opinions' on which expert testimony was required, but rather related facts and personal experiences" known to that witness); Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 583, 512 A.2d 507 (App. Div. 1986) (reasoning that "testimony of knowledgeable employees" not designated as expert witnesses was still admissible in defective product cases). *27 Quattlebaum's proffered testimony at the Rule 104 hearing related the factual details of the parties' interactions and described his own role in the events. His explanation of the bases for plaintiff's claims, as well as the charts and photographs which aided his testimony, were disclosed and provided to defendant prior to the litigation in an effort to convince it to agree to plaintiff's change order requests. The charts and information were integral parts of the parties' business dealings, rather than litigation tools or after-the-fact analyses of the type that might be created by an expert specifically for trial.
The fact that the transaction itself involved technical information and processes generally outside the knowledge of an average juror, and that Quattlebaum was qualified to explain those processes, did not transform him into an expert witness. Any opinions expressed by Quattlebaum arose from his personal dealings with the project and knowledge of the field. Because the factual predicate of the testimony emanated from Quattlebaum's personal perception, he was permitted to offer lay opinions. See N.J.R.E. 602, 701. Therefore, his testimony was proper admissible lay opinion testimony.
Quattlebaum's testimony was based on the facts known by him in his professional role as plaintiff's employee; it would not have extended beyond the bounds of his personal knowledge. On remand, plaintiff also may present testimony through Quattlebaum for any opinions informed by his knowledge of codes or standards. "A party to an action with expertise gained through such personal experience may express an opinion of the sort ordinarily provided by an expert." Cast Art Indus., LLC v. KPMG LLP, 416 N.J. Super. 76, 100, 3 A.3d 562 (App. Div. 2010), rev'd on other grounds, 209 N.J. 208, 36 A.3d 1049 (2012). He was not required to be designated as an expert witness or prepare a report in order to testify.[7] We are satisfied that it was an abuse of discretion to *28 preclude Quattlebaum's testimony.[8] *187 During the trial proceedings and on appeal, defendant contends that plaintiff was required to produce expert testimony to establish "liability." Defendant relies on Butler v. Acme Mkts., Inc., 89 N.J. 270, 283, 445 A.2d 1141 (1982), for this assertion. We disagree. In Butler, the Supreme Court found that a plaintiff must present expert testimony to establish a prima facie case when the issue involves the standard of care against which to measure a defendant's conduct. Ibid. The Court has held that when esoteric subject matters underlie negligence-based claims, the plaintiff must produce expert testimony to establish the standard of care. See, e.g. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 444, 625 A.2d 1110 (1993) (expert needed to establish the responsibilities and functions of real estate brokers with respect to open house tours); Dare v. Freefall Adventures, Inc., 349 N.J. Super. 205, 215, 793 A.2d 125 (App. Div. 2002) (expert testimony needed to evaluate the proper application of pertinent skydiving guidelines); Ford Motor Credit Co. v. Mendola, 427 N.J. Super. 226, 236-37, 48 A.3d 366 (App. Div. 2012) (expert testimony needed for establishing proper repair and inspection of an automobile).
Here, in a breach of contract case, plaintiff is not required to establish a duty of care for its prima facie case and defendant failed to provide any legal basis to show otherwise. Quattlebaum did not opine whether the drawings complied with industry standard nor was that a requirement for plaintiff to prove its case. His testimony explained the difference between the bid and the final *29 drawings, and why defendant's refusal to compensate plaintiff for the added time and labor was a breach of contract.
The court's preclusion of Quattlebaum's testimony, and its resultant dismissal of the complaint, was error. We, therefore, reverse and remand to the trial court for a new trial. The rulings dismissing plaintiff's construction lien and its recoupment claims asserted in defense to the counterclaim are also reversed. These rulings followed the trial court's erroneous conclusion that plaintiff was required to present a liability expert. Therefore, the construction lien is reinstated. We also vacate the judgment on the counterclaim. At the new trial, plaintiff is permitted to introduce testimony from both Quattlebaum and Vinson in support of its claim for recoupment on the counterclaim.
B.
In its cross-appeal, defendant argues that the trial court erred in denying its application for attorney's fees following the dismissal of plaintiff's construction lien. In light of our discussion above, and the reinstatement of the construction lien, we need not address this argument.
Defendant also contends that the trial judge erred in rejecting its expert's opinions proffered on the counterclaim, thus requiring a reversal of the ruling on the counterclaim. We disagree. A factfinder is not required to accept an expert's opinion. Pansini Custom Design Assocs., LLC v. City of Ocean City, 407 N.J. Super. 137, 143, 969 A.2d 1163 (App. Div. 2009). In the same manner as a jury, a judge sitting as factfinder may accept some parts of a witness's testimony and reject other parts. Todd v. Sheridan, 268 N.J. Super. 387, 401, 633 A.2d 1009 (App. Div. 1993). The court need not give the expert's opinion "greater weight than other evidence nor more weight than it would otherwise deserve in light of common sense and experience."
*188 Torres v. Schripps, Inc., 342 N.J. Super. 419, 430, 776 A.2d 915 (App. Div. 2001) (citing In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989) ).
*30 Here, the trial judge explained that it rejected the defense expert's claims regarding the cost to build the connections because it conflicted with the conclusions reached by defendant's own representatives in their evaluation of the change order requests. Defendant had never asserted, contrary to its expert's testimony at trial, that the cost of manufacturing decreased as the percentage of connections increased. In its ruling, the court noted several instances where the expert's conclusions were contradicted or unsupported by the evidence. It also found the testimony of plaintiff's witnesses to be more credible. We are satisfied that the judge's findings were supported by the sufficient evidence in the record. As defendant was afforded a full hearing on its counterclaim, we affirm the trial judge's ruling.
Defendant also appeals from the denial of its summary judgment motion premised on statute of limitation grounds. Defendant contends that plaintiff failed to file its complaint within the one-year limitation period required under the contract. The pertinent clause required the filing of any action against defendant arising out of a breach of the agreement "not later than one year after the cause of action has accrued."
Defendant contends that plaintiff's claim accrued on April 24, 2008, the date of the meeting to sign the contract and the receipt of the new additional drawings, and, therefore, the complaint should have been filed within a year of that date.[9] Defendant relies on P.T. & L. Constr. Co. v. Madigan & Hyland, Inc., 245 N.J. Super. 201, 584 A.2d 850 (App. Div. 1991) to support this contention.
The cause of action in P.T. & L. was grounded in tort. Id. at 207, 584 A.2d 850. There was no contractual relationship between the parties; plaintiff alleged that it was injured by defendant's tortious interference. Id. at 207-08, 584 A.2d 850. Defendant cites to this court's conclusion in P.T. & L. that the claim had accrued before a third party rejected plaintiff's change order seeking *31 additional compensation for problems and delays created by design deficiencies and misrepresentations. Id. at 206-09, 584 A.2d 850. However, in P.T. & L., we determined that plaintiff had known for several years before the change order denial that the project was designed improperly and that the defendant was the designer. Id. at 207, 584 A.2d 850. We stated: "A cause of action grounded in tort accrues, not when the tortious act occurs, but when the consequential injury or the damage occurs." Ibid.
We find the trial judge's ruling here to be consistent with our determination in P.T. & L. The issue before the court was the applicable limitations period for an action where a party rejected a change order request pursuant to a contract and when plaintiff first incurred damage. As the motion judge noted, "the contract itself allowed for modification to the contract price if changes were made by the defendant." In fact, the change order process was an integral part of the parties' performance under the contract. In June 2009, defendant issued a change order for $2,922,694.29 to reflect the increase in the amount of tonnage on the new drawings. Additional change orders were paid in October 2009 and February 2010.
In a February 23, 2010 letter, defendant offered to pay a number of outstanding *189 invoices as well as several, but not all, change orders.[10] The letter advised, however, that defendant sought to reserve the right to continue to contest the change order requests. The motion judge found that plaintiff did not suffer any "damage or consequential injury ... until February 23, 2010 when [it] first realized that there would be no increase for the CD drawings."
Although plaintiff was aware that defendant's provision of new and additional drawings changed the terms of the contract, there was a framework in the agreement to address those changes. The parties utilized this framework by issuing and paying change *32 orders for several years following the execution of the contract. Plaintiff was not damaged until defendant notified plaintiff in February 2010 that it did not intend to pay all of the change orders. As we stated in P.T. & L., there must be some damage before the accrual of an action and the commencement of the statute of limitations clock. The damage incurred by plaintiff began upon learning that defendant did not intend to accept all of the requested change orders. Consequently, the complaint filed in January 2011 was timely.
Lastly, we consider, and reject, defendant's argument that the trial judge erred in not dismissing all of plaintiff's claims on summary judgment, as it asserts that plaintiff received full payment at the contract unit price for all of the tonnage fabricated. Plaintiff disagreed with that interpretation of the contract and the implications of the contract's terms regarding change orders. We are satisfied that there was sufficient evidence in the record before the judge to support his determination that there were material issues of fact regarding the parties' intent when they signed the contract.
III.
As the trial judge rendered credibility determinations as to several of the witnesses, we direct that, on remand, the case be assigned to a different judge for trial.
We affirm the May 15, 2015 order denying summary judgment to defendant. We vacate the dismissal of plaintiff's claims as well as the judgment on the counterclaim and remand for a new trial on those issues only. We reverse the dismissal of the construction lien.
Affirmed in part, vacated in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

PSEG Power owns the real property upon which the power station is located. It was not a party to the purchase agreement entered into between plaintiff and PSEG Fossil. The PSEG entities were jointly represented. PSEG Power remained a defendant only for the purposes of the construction lien. Therefore, we will refer to PSEG Fossil as defendant.

The judge's order does not reflect if there was either a written or an oral decision. The record does not contain a written opinion or a transcript.

As an assistant engineering manager, Quattlebaum managed the detailing function of creating shop drawings and prepared and reviewed connection calculations.

As stated, Quattlebaum testified that the new drawings dramatically increased the number of connections. He stated that the labor cost for connection material was three to four times that of main material. Therefore, plaintiff could not have accurately estimated the labor costs required to fabricate the material required for the project.

The use of these rules by defendant and the court was procedurally incorrect. Rule 4:37-2(b) permits defendant to move for dismissal of the action after the presentation of plaintiff's case. Rule 4:40-1 authorizes the entry of judgment after the introduction of the opponent's evidence or at the close of all evidence. Plaintiff had not presented all of its evidence. The proper application was a renewal of the motion for summary judgment following the Rule 104 evidential hearing on the grounds that plaintiff could not sustain a prima facie case.

The counterclaim sought $2,894,821.53 plus consequential and incidental damages.

The "[d]iscovery of facts known and opinions held by experts, otherwise discoverable under the provisions of R. 4:10-2(a) and acquired or developed in anticipation of litigation or for trial, may be obtained only" in the manner and form set forth in the rule. R. 4:10-2(d) (emphasis added). Quattlebaum's testimony did not relate facts or expert opinions acquired or developed in anticipation of litigation or trial.

As a result of this ruling, we need not address whether the judge should have permitted plaintiff to designate Quattlebaum as an expert witness and serve an expert report following the Rule 104 hearing and the court's preclusion of the engineer's testimony.

The complaint was filed on January 25, 2011.

The payments were made in March 2010.