# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0044-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

     Plaintiff-Respondent,

v.

C.B.,

     Defendant-Appellant,

and

T.B.,

     Defendant.

_____

IN THE MATTER OF L.A.B.,
a minor.

_____

Submitted January 23, 2024 – Decided February 22, 2024

Before Judges Whipple, Mayer and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FN-13-0084-21.

Joseph E. Krakora, Public Defender, attorney for appellant (Adrienne Marie Kalosieh, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Nicholas Joseph Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant C.B. appeals from the January 6, 2022 order finding she abused and neglected her infant son, L.A.B., by using opioids during her pregnancy—such that the infant suffered from withdrawal symptoms after birth—and the July 25, 2022 order terminating the litigation and clearing the way for the Division of Child Protection and Permanency (Division) to proceed with terminating her parental rights.[1] C.B. argues the fact that medical personnel treated L.A.B. for withdrawal symptoms does not necessarily mean the child had

---

[1] L.A.B.'s father, T.B., is not involved in this appeal.

been exposed to opioids before birth and was experiencing withdrawal after delivery.

A child's treatment for withdrawal symptoms does not necessarily demonstrate the presence of Neonatal Abstinence Syndrome (NAS)—the formal name for withdrawal—but the medical indications leading to such treatment may provide competent evidence to support a diagnosis of NAS. Here, there is sufficient credible evidence in the record to support a finding the child suffered "actual harm as a result of the mother's use of opioids during pregnancy." We, therefore, affirm the Family Part judge's decisions for the reasons below.

I.

We recite the relevant facts as gleaned from the record. Defendant C.B. gave birth to her infant son, L.A.B., by cesarean section in January 2021. Shortly before the birth, C.B.'s urine tested positive for opiates. Upon delivery, L.A.B. had Apgar scores of seven and nine at one and five minutes, respectively, but it became apparent that he may have aspirated meconium,[2] so he was transferred to the neonatal intensive care unit (NICU) at Jersey Shore University

---

[2] Meconium is a newborn's first bowel movement that the newborn can sometimes breathe in, or aspirate, during the birthing process. Meconium aspiration can lead to lung irritation, respiratory distress, and potentially reduced oxygen absorption.

Medical Center (JSUMC) for specialized care for respiratory distress. Shortly after, L.A.B.'s urine drug screen came back negative, but, almost a week later, his meconium drug screen came back as presumptively positive for opiate(s) based on a biochemical test. The sample available was too small, however, for the confirmatory test that could have identified the kind of opiate present. The lab results noted an "[u]nconfirmed positive may be useful for medical purposes[] but does not meet forensic standards."

Meanwhile, C.B.'s mother—who had custody of C.B.'s other two children, since the Division terminated C.B.'s and the children's father's parental rights to them—reported to the Division in early February that C.B. had given birth to L.A.B. The Division began to investigate C.B. by interviewing the parents and getting reports from the clinicians and social workers at both Riverview Medical Center and JSUMC.

Upon admission to the NICU, L.A.B. was observed to be hypertonic and jittery, causing a concern of possible early signs of NAS. The child's doctor determined the nurses should begin following the Finnegan score protocol.

The Finnegan score—formally known as the Neonatal Abstinence Score—is a diagnostic guideline that helps clinicians assess whether a child is undergoing NAS severe enough to require treatment. The Finnegan score

assesses twenty-one symptoms by assigning them point values, from one to five, depending on the severity of the symptom. If a symptom is not observed, then it is assigned a zero. The Finnegan score is the total arrived at by adding all twenty-one point-values together. Scores of seven and below are considered normal, while scores of eight and above are causes for concern. Under the standard protocol, a child under observation should be scored every four hours. However, if the child receives an elevated score of above eight, the child should be assessed and scored every two hours. The child likely requires treatment with medication when the Finnegan score is eight or above for three consecutive scorings (e.g., 9-8-10) or when the average scores of three consecutive assessments is eight or higher (e.g., 9-7-9).

At 11 a.m. on the day after his birth, L.A.B.'s medical records showed his overnight Finnegan scores were 7/8/10/10. The doctors determined L.A.B. was presenting symptoms of NAS and prescribed methadone. L.A.B.'s medical records from the following day, showed his Finnegan scores were 10/9/5/5/9/7/9/9. His methadone treatment continued, and his Finnegan scores generally trended down over the next two weeks. As his Finnegan scores decreased, his dose of methadone appropriately decreased as well, until the treatment ceased in mid-February.

5

In preparation for L.A.B.'s discharge, the Division initiated emergency removal of the child, and filed a complaint for emergent custody, care, and supervision of L.A.B. At a hearing, the judge ordered the emergent removal, granted the Division continued custody, care, and supervision of the child, and issued an order to show cause.

However, on the date of his scheduled discharge, L.A.B. exhibited increased irritability and poor feeding. Thus, the doctors declined to discharge him and continued observation to determine whether to resume administering methadone. Over the next couple days, L.A.B.'s Finnegan scores were 3/6/4/5/5/6/8 and 10/5/10/7/7/7. L.A.B. received a low dose of methadone and was slowly weaned off after four days. After being stable for two days, L.A.B. was discharged to the care of his maternal grandmother.

The court held numerous hearings concerning the parents' compliance with court orders before the fact-finding hearing, scheduled to begin in June 2021. The fact-finding was adjourned twice, first to allow the mother and then the Division, to secure experts and reports. After the fact-finding hearing, the trial judge issued an order and decision on January 6, 2022, finding the Division "met their burden of proving by a preponderance of the evidence that baby

A-0044-22

[L.A.B.] suffered a substantial risk of harm and actual harm as a result of the mother's use of opioids during her pregnancy."

The trial judge approved the Division's proposed permanency order, and the Division filed a complaint for guardianship. At a July 25, 2022 hearing, the trial court judge terminated the litigation, allowing the Division to proceed with a new action to terminate the parental rights of C.B. and the child's father. This appeal timely followed.

## II.

On appeal, C.B. argues the Family Part judge incorrectly weighed factors in finding she had abused and neglected her son pursuant to N.J.S.A. 9:6-8.21(c) and the Division failed to carry its burden of proof under that statute. We disagree.

We review the factual findings and conclusions of a trial judge with "deference to the trial court's credibility determinations and its 'feel of the case' based upon the opportunity of the judge to see and hear the witnesses." N.J. Div. Youth & Fam. Servs. v. A.R.G., 361 N.J. Super. 46, 78 (App. Div. 2003) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). We should likewise "defer to the trial court's assessment of expert evaluations." N.J. Div. Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 221 (App. Div. 2013) (citing In re

7

Guardianship of D.M.H., 161 N.J. 365, 382 (1999)).  While a trial judge has the discretion to accept parts of a witness's testimony and reject other parts, it is also within their discretion to accept or reject a witness's testimony in its entirety. See E&H Steel v. PSEG Fossil, LLC, 455 N.J. Super. 12, 29 (App. Div. 2018). We examine such decisions for an abuse of that discretion.  See H.R., 431 N.J. Super. at 221.

"Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare, 154 N.J. at 413.  This court will not disturb the trial judge's findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice."  Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (citation omitted).

On the other hand, a trial court's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  N.J. Div. Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty, L.P. v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

A-0044-22

New Jersey's child welfare laws strike a "balance between two competing interests: a parent's constitutionally protected right to raise a child and maintain a relationship with that child, without undue interference by the State, and the State's parens patriae responsibility to protect the welfare of children." Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 17–18 (2013) (internal quotations omitted). Title Nine, aims to "protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" Id. at 18 (quoting N.J.S.A. 9:6-8.8(a)). "The law's 'paramount concern' is the 'safety of the children' and 'not the culpability of parental conduct.'" Ibid. (first quoting N.J.S.A. 9:6-8.8(a), then quoting G.S. v. N.J. Div. of Youth & Fam. Servs., 157 N.J. 161, 177 (1999)). With that focus in mind, Title Nine states that a child is abused or neglected when that child's

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court;
>
> [N.J.S.A. 9:6-8.21(c).]

A-0044-22

The New Jersey Supreme Court has repeatedly asserted that the presence of withdrawal symptoms in a newborn can establish actual harm to the child. See A.L., 213 N.J. at 22–23; In re Guardianship of K.H.O., 161 N.J. 337, 349 (1999).  A finding of abuse and neglect can be based on the mother's substance abuse during pregnancy, when it results in the child's addiction and subsequent withdrawal symptoms after birth.  See K.H.O., 161 N.J. at 350.  The evidence of withdrawal symptoms "may come from any number of competent sources[,] including medical and hospital records, health care providers, caregivers, or qualified experts."  A.L., 213 N.J. at 23.

Here, the Family Part judge found the Division met its burden of proving, by a preponderance of the evidence, that L.A.B. suffered a substantial risk of harm and actual harm as a result of the mother's opioid use during her pregnancy. In reaching this decision, the judge reasoned "[t]he mother has a history of substance abuse, the mother's urine was positive for opiates, the baby's meconium was presumptively positive for opiates and therefore the doctors and nurses at [JSUMC] evaluated baby [L.A.B.] for withdrawal."  Further, she found "[i]n their experience, using the Finnegan scoring system, [clinicians] determined that baby [L.A.B.] was suffering from withdrawal and needed to be

administered methadone to ease his symptoms. Baby [L.A.B.] remained in the NICU for a little over three weeks."

Although the presence of respiratory distress due to meconium aspiration presented a potential alternative cause for the symptoms observed in L.A.B., such that they may not necessarily be attributable to withdrawal, we conclude the judge's findings were supported by sufficient credible evidence in the record and should not be disturbed.

During the hearing, the judge accorded greater credibility to the Division's expert than to C.B.'s expert. C.B. asserts the Family Part judge erred in this credibility determination because the judge concluded C.B.'s expert was "clearly unaware of the extent of the mother's substance abuse" and, therefore, relied inappropriately on information relating to the mother's behavior during pregnancy, as opposed to "the condition of the child at issue," as is required by Title Nine. Although the judge did consider this issue in assessing the experts' credibility, the judge's analysis was appropriate. The mother's history of drug use was a relevant factor in determining whether using the Finnegan scores to assess L.A.B.'s condition was proper. C.B.'s expert herself testified that "[e]ither [the mother's history of drug use] or if her urine is positive" should

11

indicate to a doctor to "at least suspect that there may be a [withdrawal] issue for the baby."

C.B. also argues the Family Part judge erred by disregarding C.B.'s expert's assertion the Finnegan scale should not have been used to assess the severity of withdrawal symptoms in a child suffering from other maladies, such as respiratory distress due to meconium aspiration. C.B.'s expert opined other underlying health challenges could lead to elevated Finnegan scores, even if the child was not experiencing NAS. The expert suggested instead the symptoms could be attributable to other issues and combined in a way that mimicked NAS.

We reject C.B.'s argument the Family Part judge's decision to accord less weight to C.B.'s expert's testimony and report shifted the burden to C.B. to show that L.A.B.'s symptoms were caused by other conditions. Instead, the record directly supports the judge's decision to accord the Division's expert greater credibility than C.B.'s. Both experts relied on L.A.B.'s extensive medical records to prepare their reports, but the data reported by C.B.'s expert deviated from the data in L.A.B.'s records. In fact, C.B.'s expert omitted unfavorable data and inaccurately recorded other data such that it supported her conclusion that L.A.B.'s symptoms may have had other causes besides NAS. Because of these

12

factual inaccuracies, the judge's determination that the Division's expert provided more credible evidence was not an abuse of discretion.

C.B. also challenges the judge's reliance on the presumptively positive test result that indicated the presence of opiates in L.A.B.'s meconium, but the judge only referenced that test in considering the decision of "the doctors and nurses at [JSUMC to] evaluate[] baby [L.A.B.] for withdrawal." The judge did not rely on that test to conclude L.A.B. did, in fact, have opiates in his system. The judge only considered that test as another factor supporting the clinicians' decision to observe L.A.B. for potential signs of NAS. Although this test result was returned four days after L.A.B.'s healthcare providers decided to observe the child for NAS, any perceived error resulting from the judge's consideration of this test is harmless. The record contained sufficient other evidence to support the doctors and nurses' decision to assess L.A.B. for NAS.

Based on our review, the underlying medical evidence upon which the healthcare providers relied to treat L.A.B. with methadone, as well as other competent evidence contained in the record, support the judge's finding C.B. abused and neglected her son.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13