NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

Corrected 11/6/24 – page 36, line 3 reads "concluded cost of" goods

```
-------------------------------------------------x
LA TRONCAL FOOD CORP. AND      :    TAX COURT OF NEW JERSEY
VICENTE INTRIAGO,              :     DOCKET NO.: 013472-2017
                               :
                               :
                               :
                               :
         Plaintiff,            :
                               :
          v.                   :
                               :
DIRECTOR, DIVISION OF          :
TAXATION,                      :
         Defendant.            :
                               :
-------------------------------------------------x
```

**Approved for Publication
In the New Jersey
Tax Court Reports**

Decided: **October 2, 2024**

Chinemerem Njoku for plaintiff (C.N. Njoku, LLC., attorney).

Heather Lynn Anderson for defendant
(Matthew S. Platkin, Attorney General of New Jersey, attorney).

NUGENT, J.T.C.

This opinion following trial resolves plaintiffs' (collectively "Taxpayer") challenge to the assessment issued by defendant, the Director, New Jersey Division of Taxation ("Taxation"), after audit of Taxpayer's pizzeria. The auditor utilized an indirect methodology and estimated revenue upon a finding that Taxpayer's books and records were insufficient to verify the sales as reported. Taxpayer produced evidence at trial to contradict the reasonableness of the data and methodology

*

employed in the auditor's analysis.[1]  Taxation sought to admit the audit report and certain work papers of the auditor,[2] and testimony of the auditor's supervisor in support thereof based on her knowledge of audits in general.  Thereby, the court also decides Taxpayer's objections to the admission of the evidence and Taxation's contentions that (1) the documents are admissible under Evid. R. 803(c)(6) (business records exception) and Evid. R. 803(c)(8) (public records exception); and (2) the witness' testimony is admissible as an opinion of a "quasi-expert."

FACTS

Taxpayer, La Troncal Corp., operated a business trading as Roma Pizza Restaurant, located at 245 Adams Street, Newark.  Vicente Intriago and his father-in-law, Cesar Villa, were the principals and operators of the business from 2005 through October 2013.  In January 2014, La Troncal Corp. and Vicente Intriago sold the business to San Gerardo Food Corporation and Cesar Villa.[3]  Apparently, Villa

---

[1] As part of its sales tax examination the auditor determined that Corporate Business Tax ("CBT"), Gross Income Tax-Employer (withholding taxes) ("GIT-ER") and Litter Tax had also been under-reported.  Given the auditor's conclusions, Taxation issued a Notice of Assessment Related to Final Audit Determination in the total amount of $334,440.99.  The estimated assessment covers the following taxes and audit periods: Sales and Use Tax ("SUT"), 4/1/11 – 3/30/2014; CBT, 1/1/11 – 12/31/13; Litter Tax, 1/1/2011 – 12/31/2013; and GIT-ER, 1/1/2012 – 12/31/2013.

[2] Taxpayer objects to bate stamp numbers D000600-D000603, identified as a portion of the auditor's work papers, and marked for identification as D-3.  The audit report was marked for identification as D-1.

[3] Taxpayer contends the buyer properly filed a Bulk Sale Notification at the time of the sale.  Neither party proffered the Notification as evidence.

continued to operate a business at the same location after the sale. Intriago and Villa were estranged at this point, and Intriago was neither an owner nor operator of that business, nor did he work there. Intriago opened another pizzeria in Newark in April 2014.

At trial Taxpayer produced the following witnesses: Vicente Intriago and Aloy E. Nwosu, CPA, who the court qualified as an expert over Taxation's objection.[4] Taxation proffered the assistant audit chief to testify. A Spanish speaking interpreter assisted Intriago throughout the trial, and both parties admitted various documents into evidence.

Intriago described how he and his father-in-law operated Roma pizzeria. The pizzeria fronted Independence Park in Newark, located among a laundromat, and other businesses that sold Spanish food and Portuguese food. In the summer food trucks were parked outside of Taxpayer's pizzeria. Taxpayer employed two individuals full-time. Intriago worked at the front of the pizzeria interacting with customers, and his father-in-law cooked.[5] It was a small storefront business with

---

[4] Taxation objected on the sole basis that Taxpayer did not require an expert witness since the case "is essentially a books and records case." The court herein did not give weight to the expert's opinion regarding the sufficiency of Taxpayer's books and records which is a legal issue left to the court's determination. The court found that the expert met the qualifications set forth in Evid. R. 703, and that the expert's testimony regarding his reconciliation of the Taxpayer's records and determination of tax due was credible and of assistance to the court. The court qualified the witness as an expert for that purpose.

[5] On occasion La Troncal employed a delivery person who worked for a few hours a week, not full-time nor on a regular basis.

three tables, two in the dining area and one in the kitchen. Intriago's relationship with his father-in-law began to deteriorate around 2011. They fought frequently about how the pizzeria should be run and its hours of operation. During that time his father-in-law would take time off away from the business or open the pizzeria for only four hours a day.

The pizzeria accepted both cash and credit cards, but sales were largely cash transactions. Rent, salary, and utilities were paid in cash and vendor purchases were largely made in cash and by check. Any remaining cash was deposited in the bank. Sales were transacted with a cash register but the testimony regarding cash register receipts was somewhat contradictory. Intriago testified that they did not retain register receipts and used the cash register only to calculate the customer's bill. On cross-examination and re-direct he testified that they did retain at least some register receipts that were provided to the former accountant to prepare Taxpayer's tax returns. The former accountant died in or around January 2013. After his death Taxpayer was unable to retrieve any of the documents previously provided to his office.

At trial, Intriago produced hand-written summaries of weekly income for 2012 he had prepared for the former accountant. Asked on cross-examination whether he had also prepared a simultaneous record of the receipts used to create the summaries, he said he had not. Per Intriago, contrary to the auditor's report, the

4

bank statements produced to the auditor included cancelled checks attached to the bank statements written for vendor purchases and Intriago pointed to the cash deposits reflected in the bank statements.

The auditor's investigation began in early September 2014, after the sale of Taxpayer's business. As part of the investigation the auditor prepared a Case History outlining some of the auditor's steps.[6] Among the entries, the Case History contains the following notes: "09/3/2014 Initial letter sent to taxpayer; 09/22/2014 Called the Resturant [sic]; 09/26/2014 Visited the restaurant with my supersor [sic] James Pelka for lunch. The pizza restuarant [sic], Trade name: Roma Pizza & Restaurant, is located in the Ironbound Section of Newark, New Jersey; 10/06/2014 Attached please find menu and the copy of the Bill from our Lunch. [L]isted [sic] on that menu are completely different from the Roma Pizza menu. [T]he taxpayer have [sic] a different menu (full menu with appertizer [sic], entries, and desserts) for Ecuadorian Food; The day of our visit, we noticed 5 people working at the restuarant [sic] (3 Cooks). The dining room area had 4 booths for a total seating occupancy of 16; 01/13/2015 Arbitrary Assessment sent to the Taxpayer by certified mail." In the report, the auditor's observations among other facts, were deemed to be "Unusual Circumstances."

---

[6] Taxation proffered the document as evidence in its case. The document was entered into the record without objection.

A copy of the assessment was sent to Intriago via certified mail to his personal address listed on the CBT returns. Upon receipt of the assessment, Intriago contacted the auditor to advise he had no more association with Roma pizzeria having sold his interest in the business in January 2014, and therefore had limited access to Taxpayer's records. He requested additional time to produce any available records as production was otherwise hampered by the dispute with his father-in-law and the death of Taxpayer's former accountant. Intriago then gathered and produced the following to the auditor: a signed Post Audit Conference (signed as disagreed); Bill of Sale of Business dated January 24, 2014; copies of forms NJ 927, W-2s, and W-3s for 2012 and 2013 (two employees listed); and ST-50 tax returns for tax years 2012 and 2013.

At a subsequent meeting with the auditor, Intriago received an Information Document Request ("IDR") addressed to Taxpayer requesting: purchase invoices for January through December 2013; bank statements for January 1, 2011 through December 31, 2014; all New Jersey W-2 and W-3 forms for 2012, 2013 and 2014; General Ledger or Trial Balance for 2011 through 2014; Cash Disbursement Journal for January 1, 2013 through December 31, 2013; Signed Consent Form; signed Acknowledgement of Responsibility Form, and signed Sampling Agreement. The sample year selected was 2013. In response to the IDR, Intriago reproduced already

submitted documents, and he produced Taxpayer's 2011 through 2013 bank statements.

Based on a review of that information, the auditor advised that Taxpayer's documents were insufficient to conduct a full examination and that the case was being sent to audit billing, with the estimated assessment unchanged. The audit report dated June 15, 2015, was then issued in which the auditor reported his conclusions. Per the report "Taxpayer's provided records were insufficient to conduct the audit." In the section titled "Sales Tax" he explained the indirect method he used to determine the tax liability as follows:

> 2013 was selected as the sample year. The taxpayer failed to provide purchase invoices and other documents requested on the NJ IDR (Record Request). Based on the facts listed above (Unusual Circumstances) the taxpayer's records were deemed insufficient to conduct the audit examination. Hence, the auditor was forced to compute an estimated assessment to prevent additional period from expiring. Purchases for each year of the audit period were estimated to be $250,000. Because the taxpayer did not report beginning or ending inventories on the CBT Returns for all years in the audit period, the estimated purchases of $250,000 was used as the COGS. An estimated mark-on of 3.5 was applied to each year's COGS to determine the audited gross receipts. The taxpayer was given a 10% credit for theft and spillage (as per division practice). In addition, the taxpayer was given credit for Sales Tax reported during the audit period (See Electronic Index, Schedule S-1).

Per the audit report in calculating the CBT assessment the auditor "adjusted Taxpayer's reported COGs [cost of goods sold] and reported Gross Receipts using

7

the same estimated COGS and Sales resulting from the Sales Tax examination." As to the GIT-ER assessment, the auditor reported:

> Payroll records were examined for the entire audit period (01/01/12 to 12/31/2013). The taxpayer provided W2s for all employees as per the NJ IDR. The taxpayer had only two employees on Payroll for years examined. However, during the auditor's visit to the restaurant for lunch on September 26, 2014, there were five people working that shift. Hence, additional GIT taxes were assessed for five employees and the taxpayer was given credit for taxes remitted (See Electronic Index, Eskort GIT Work Paper & Schedules G-1 and G-2).

After receipt of the estimated assessment, Taxpayer filed an administrative protest with Taxation's Conference and Appeals Branch (CAB), dated July 28, 2015. Taxpayer followed up with a letter (from the accountant who would serve as his trial expert) addressed to CAB, dated September 22, 2015. The letter was admitted into evidence in Taxpayer's case and reads:

**<u>Requested documents submitted herein</u>**

Please find attached the following documents to support our appeal:

Purchase invoices for the test period 01/01/2013 through 12/31/2013.

1. Bank statements [sic] the periods 01/01/2011 through 12/31/2014.
2. NJ W2s and W3s for years 2012, 2013 & 2014.
3. General Ledger or Trial Balance for years 2011, 2012, 2014 &2014 [sic]. None attached. (Taxpayer is a small pizza restaurant, no general ledger and trial balance. The summary of Receipts and Disbursements are attached to the bank statements enclosed herein).

8

4. Cash Disbursement Journal for period 01/01/2013 through 12/31/2013. (See summary of Receipts & Disbursements attached to bank statements).
5. Signed Consent Form – Already provided to auditor during visit.
6. Signed Acknowledgement of Responsibility Form – already provided to auditor.
7. Signed Sampling Agreement - already provided to auditor.

Other matters we need to bring to your attention:

-The business was owned by two people – 1. Mr. Vicente Intriago and 2. Mr. Villa Cesar.

-In January 31, 2014, the business was bought over by part-owner Mr. Villa Cesar and at that time, Mr. Vicente [sic] ceases to be an owner of the business.

-Since 2011 through 2013 the business has only two employees in the payroll.

-During these periods 2011 through 2013 the business has filed and reported State Sales taxes and State Payroll Taxes.

Taxpayer's protest to CAB was assigned a July 2017, conference date. In lieu of conducting an administrative conference, CAB first remanded the case back to the auditor for reexamination. Taxation produced a memo from the auditor addressed to CAB entitled "Re: Case Returned for Rexamination [sic]." The memo dated April 28, 2017, was admitted into evidence by Taxation without objection. The auditor's memo reads:

The taxpayer's representative, Mr. Aloy E. Nwosu, provided the below listed documents:
1. CBT Returns for the following years: 2011, 2012, and 2013

9

2. JETRO Cash & Carry (Restaurant Depot) Summary Purchase for 2011, 2012 and 2013
3. Bank Deposit Summarized for 2011, 2012, 2013, and January of 2014
4. A memo listing Rent Expense for 2011, 2012 and 2013

The auditor sent Third Party Request to Roma Performance Food Group, Inc., on July 28th, 2016 and January 9th, 2017 requesting purchase records for 2011, 2012, and 2013. The vendor failed to return the purchase records requested.

On April 25th, 2017 the auditor met with Mr. Nwosu to discuss the audit status. Mr. Nwosu stated that the records provided are sufficient to conduct the audit examination. He pointed out that La Troncal Food Corp. is a "Mom and Pop" business and Sales Tax for the audit period should be determine [sic] based on the Bank Statement summary provided. Mr. Nwosu stated that he will not agree with any assessment determine [sic] by estimating the taxpayer's gross receipts.

The auditor discussed the records provided by the taxpayer's representative with his supervising auditor Ms. Nokeima Jones. Ms. Jones agreed with the auditor that the records provided were not sufficient to conduct an audit examination. Therefore, this case is being returned to CAB without any adjustments to the original assessment. The auditor met with the taxpayer's representative, Mr. Nwosu on April 27th, 2017 and informed him that the audit is being returned to CAB unchanged.

At trial, Taxpayer's expert testified that he questioned the auditor's continued insistence that "the records provided were not sufficient to conduct an audit examination" as set forth in the remand memo. In his memo returning the case to CAB, the auditor rejected the information as "inadequate" and reaffirmed the assessment.

The expert disagreed with the auditor's concluded estimated figures and the estimated assessment particularly given the size of Taxpayer's business, that sold no liquor, and which he described as "Mom and Pop." He disagreed with the auditor's continued resort to an indirect mark-on methodology. Per the expert, when he inquired why Taxpayer's documents were still deemed insufficient the auditor told him that "he had no time to perform an audit." The expert clarified, though a general ledger had not been provided, Taxpayer did provide information which comprises a general ledger and a cash disbursements journal, including, bank statements; summary of cash receipts; and cash disbursements, as well as the 2013 purchase invoices as requested by the auditor.

In his testimony, the expert described how he reconciled Taxpayer's various information and documents, vendor statements of summary purchases, proof of expenses like rent and salaries, bank statements and tax returns, and produced his summaries to the auditor. Taxpayer relied on the expert's review of the records produced to the auditor and the expert's ability to reconcile them with the tax returns. Using the reconciliation, the expert concluded that taxpayer owed tax above the amount remitted with the tax returns, though in an amount well below the assessment.

At trial, Taxation produced the assistant (field) audit chief because the auditor who had performed the audit left Taxation a year or two after the audit, and per

11

Taxation, was unavailable to testify at trial. The assistant (field) audit chief was proffered to testify about the auditor's report and work papers, and her opinion of the substance and quality of the auditor's conclusions. Taxation sought to admit the witness as one with personal knowledge of the audit based on her supervisory role and proffered the witness as a "quasi-expert."[7] Given the unusual circumstances presented, in the absence of the auditor, the court permitted the witness to testify to gain an understanding of her role in the audit and to assess whether she had sufficient personal knowledge to permit her to offer lay opinion testimony and to assess the reliability of the documents at issue.[8]

The witness has been employed by Taxation since 1993 when she graduated from college with a B.S. degree in accounting. She worked for Taxation in various audit roles.[9] As assistant chief she was responsible for reviewing audits that exceeded $250,000 under her line of supervision. Ten supervisors reported to her, and she supervised and oversaw between 45-50 employees. She testified generally, that at the conclusion of any audit subject to her review she would review the audit

---

[7] Essentially as a witness qualified to provide lay opinion testimony under Evid. R. 701.

[8] The court reserved decision on Taxpayer's objections subject to post-trial briefing on the issues. Notably, Taxation had included the name of other witnesses in a pre-trial submission, one of whom was in court during the trial but not called to testify. Taxation advised the court and Taxpayer it would not seek to reopen the evidence regardless of the court's rulings on Taxpayer's objections to the witness and documents under consideration.

[9] At the time of trial, she was employed by Taxation as Chief of Audit.

narrative, the auditor's work papers and any papers in the audit file.  She would check the work papers for accuracy but would not check every calculation or check the math.  She would make sure everything "tied in" from one work paper to the next.  The witness testified that as supervisor she followed that procedure with the subject audit.

In response to questions about the subject audit, the witness was unable to describe the contents of the audit file but said that the forms used by Taxation are standardized and that all audit files generally contain the same documents.  Asked on cross-examination whether pre- and post-audit conferences were conducted in this case, she had no knowledge.  In reviewing an audit, she might approach the auditor's direct supervisor, or the auditor, if any issues arose.  That did not occur here.  The witness had no conversations with the auditor or the auditor's direct supervisor in this case.  She was not involved in the actual audit.  Her role was reviewing the audit file.  The witness was not within the auditor's direct line of supervision during the time of the audit.  She also testified that her supervisory review did not include examination of Taxpayer's 2013 purchase invoices, nor the bank statements produced to the auditor as that was not a part of her role as a manager.

Taxation relied on the witness to introduce the auditor's report and work papers drawing on her experience as an auditor to explain the purpose of the

documents and asked the witness questions about the specifics of the auditor's examination based on their contents. Taxpayer objected to the testimony alleging that the witness lacked personal knowledge of the audit. Candid in its proffer, Taxation stated that the audit report "speaks for itself, therefore the witness does not have to have personal knowledge as much as reading the information that is in the report and then I'll be asking questions about [the witness's] opinion regarding the report."

In response to the objection, Taxation elicited testimony about the witness's audit experience and the nature of her supervisory role in the subject audit. Throughout the witness's testimony Taxation asked her to describe the auditor's actions and asked her opinion of the audit results. The questions largely solicited the witness's opinion on two central topics: whether Taxpayer's records were sufficient to verify the tax returns and whether she considered the auditor's actions and his concluded estimates to be reasonable. In one instance, the witness was asked "whether you can determine whether or not in your opinion, are the [Roma] purchase invoices complete." Asked by the court whether Taxation sought to qualify the witness as an expert, Taxation explained, "it's in her years of experience as a Division of Taxation auditor as well as a supervisor, a quasi-expert, but not to the full level of an expert . . . it's a factual decision, this isn't something that requires an

14

outside expert.  It's based on her years of experience.  If she were the auditor, what would she do because she can tell us what the standard procedure is."

Set forth below are excerpts of the witness's trial testimony relevant to the issues before the court.

Direct examination:

Q. You said the purchases were estimated.  Based on your knowledge of this business from reading the audit report and listening to the testimony that you've heard from Taxpayer's accountant and from Taxpayer's former owner, does $250,000 seem reasonable to you in your experience?
A.  It appears reasonable to me.
Q.  Why do you believe that $250,000 is reasonable for purchases.
A. Based on the testimony I heard before, the size, the location of the business, based on my experience, it's a reasonable number, not an outrageous number.  He didn't have actual purchase invoices to add up so he had to do the best he could, I assume, at estimating what the number should be.

Court Questions:
Ct. Q. And where did the $250,000 come from that the auditor determined as purchases.
A.  He just estimated.
Ct. Q. Do you know what he based the estimate on?
A.  He just estimated based on the factors he knew – the size of the business, what would be a reasonable figure.
Ct. Q. Again, you didn't talk to the auditor about the basis for his estimate?
A.No but it's the procedure. It's … I've been doing this a long time – this is what we do… He didn't have any Taxpayer invoices to add up to … he had to pull a number out of … yeah … ok… I mean I am interpreting the narrative, and I am familiar with our procedures.  So, he made up the number based on whatever factors he could consider.

Direct examination:

15

Q. You heard testimony previously of the taxpayer accountant talking about purchase invoices. Have you had a chance to review the invoices that were submitted by the accountant?

A. There were some invoices.

Q. Were they complete?

A. Clearly not. No.

Q. Why do you say clearly not.

A. Because over the course of the year you are going to see purchases of certain food items – if it's a pizzeria they're going to be buying the same kind of thing every week. You're going to see purchases of the same food items every week. You're going to see certain things purchased on a regular basis. There was not a complete set of purchase invoices there … All I can testify to is what the auditor wrote that he did not have all the invoices. The auditor did not have all the purchase invoices.

Q. Are these documents sufficient to show you as an auditor what the purchases are, for the sample period.

A. These are not a year's worth of invoices.

Cross-examination:

Q. In the report it says [Taxpayer] didn't provide purchase invoices from periods beginning 1/1/13 through 12/2013. Correct?

A. Correct

Q. Did you subsequently see that document at the time that you did your review?

A. No. There were no documents in the file.

Q. You testified to some purchase invoices from [Roma] Performance this afternoon. Correct?

A. Correct…I don't know if these invoices were provided to the auditor or not. They were presented to the court. I have no idea if they were presented to the auditor.

Q. So did you even review any documents at all that was provided during the audit period or after the audit period.

A. I reviewed the audit file in 2015.

Q. You don't know whether Mr. Intriago subsequently provided these documents to Conference and Appeals.

A. Yeah, that I don't know, that information I wouldn't have.

Q. Because it was not reflected in the auditor's report, correct?

A. Correct.

Q. So you don't know what happened at CAB?

A. I assume they upheld the assessment and that's how we ended up here.

Q. So basically, what they did was to uphold everything that was said despite the fact that the purchase invoices were provided.

A. The purchase invoices weren't provided.

Q. Did CAB approve the audit report provided by [the auditor]?

A. Yes.

Q. And you know it didn't include the purchase invoices provided to the Division.

A. I didn't know who the invoices were provided to. There was only a handful….

Q. [The auditor's] report did not include the purchase invoices in the report.

A. I don't know if they provided them to him or to conference or not. I don't know who they were provided to. They were only a handful anyway. They weren't helpful. … I have no knowledge of when we got these invoices. I'm not exactly clear when the invoices were provided. Whoever they were provided to it was only a handful, they aren't even helpful.

Direct Examination:

Q. And plaintiff's accountant submitted bank statements for the court to review, and I'm going to ask you again, are bank statements sufficient to support filed tax returns.

A. No.

Q. Other than not being a source document, are there any other reasons why a bank statement might not be sufficient to support a filed tax return.

A. A sale doesn't necessarily make its way into the bank.

Q. Why.

A. There's a number of reasons. There could be cash purchases, sales would be recorded but bank statements only record what makes its way to the bank. So, then you could have spent the money on purchases, there could have been some kind of cash wages or payout of cash tips.

Q. So, if you had an audit where the only documents provided were bank statements, your conclusion would be, what would your conclusion be?

17

A. My conclusion would be I couldn't verify that the reported sales were accurate because I didn't have enough documents that supported the sales. I didn't have the documents to show where the sales number comes from.

Q. And if you come to that conclusion as an auditor, what would your next step be.

A. My next step would be to ask the taxpayer if they had any other documents.

Q. And if they didn't?

A. Then I would probably have to make an estimate… I'd have to make an estimate.

Q. Can you explain what you mean by an estimate.

A. If I can't verify that the taxpayer's returns are correct, in order to protect the State's interest, I have to do an estimated assessment and if the taxpayer has any other documents, he would come forward with them.

Q. What do you mean by estimated assessment?

A. We will look at what was reported and perhaps estimate a tax liability based on what we have seen, what we have available to us. And, also, again to protect the state's interest we will do an estimated assessment.

Q. What did the auditor do in this case based on his audit narrative.

A. The auditor did do an estimated assessment. He worked with what he had and tried to come up with a little more detailed estimate of what would be reasonable whereas sometimes we just literally make up a number if taxpayer doesn't provide us with any records at all.

Court questions:

Ct. Q. What are you basing what you just said that he tried to come up with something reasonable – are you reading something from the report or are you just testifying to this based on your experience.

A. Well, I'm reading what he did on the report but she's asking me what I would do as an auditor with a limited amount of information.

Ct. Q. You said he tried to come up with an estimate…a reasonable estimate…but where does it say that. You said that's what he did.

A. Well, I inserted the word 'reasonable.' He estimated an amount of purchases and implied an estimated mark on to come up with an estimated sales figure. The term reasonable was my testimony but the part, what he did, was from the audit report.

18

Ct. Q. What was the estimated mark on used by the auditor.
 A. 3.5.
Ct. Q. Do you know what he based the estimate on.
A. He just estimated based on the facts that he knew – the size of the business, what would be a reasonable figure.

Direct Examination:

Q. Did you speak with the auditor about it?
A. No but its procedure.
Q. Based on your years of experience do you believe [the number] is reasonable.
A. Yes.

ANALYSIS

I.      Sales and Use Tax Act

Taxation's proffer is best understood against the backdrop of the statutory scheme established through the Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29 (the "Act"). As a vendor of tangible personal property (the pizzeria's sale of prepared food), Taxpayer was responsible for collecting tax on the sale of its products. N.J.S.A. 54:32B-3(c)(1); N.J.S.A. 54:32B-12(a). The Act "squarely places on the vendor the obligation of establishing that it correctly reports its collections of tax." Yilmaz, Inc., v. Dir., Div. of Taxation, 22 N.J. Tax 204, 230 (Tax 2005), aff'd, 390 N.J. Super. 435 (App. Div. 2007).

The Act requires that taxpayers maintain books and records of its transactions for examination by the Director, charged with verifying that a taxpayer has filed returns properly and paid the correct amount of tax. N.J.S.A. 54:32B-16; N.J.A.C.

18:24-2.3, 2.4.  In performing that obligation, the Director may find a taxpayer has failed to file a tax return, or that a filed return is "incorrect or insufficient." N.J.S.A. 54:32B-19.  By law, "Taxation can reconstruct a taxpayer's receipts subject to tax and determine the correct tax if the taxpayer's books and records are inadequate or there are justifiable reasons to believe that a filed tax return 'is incorrect or insufficient.'"  Saulwil, Inc. v. Dir., Div. of Taxation, 31 N.J. Tax 433, 447 (Tax 2020) (internal citation omitted).

The Director "shall . . . determine[] [the amount of tax] from such information as may be available."  N.J.S.A. 54:32B-19.  The statute has broad application, authorizing Taxation to estimate the tax using "external indices, such as stock on hand, purchases, rental paid, number of rooms, location, scale of rents or charges, comparable rents or charges, type of accommodations and service, number of employees or other factors." Ibid.  The adequacy of a taxpayer's books and records depends on the "facts and circumstances of each case."  Saulwil, 31 N.J. Tax at 449.

The Act authorizes the Director "[t]o prescribe methods for determining the amount of receipt . . . and for determining which of them are taxable and which are nontaxable."  N.J.S.A. 54:32B-24(4).  In a direct cash audit, a taxpayer's gross receipts are reconciled between a taxpayer's filed tax returns, and the taxpayer's records including, general ledgers, sales journals, summary sales records, etc.  When a taxpayer's books and records are deemed to be inadequate Taxation may resort to

an indirect audit method, such as a mark-on analysis. The mark-on calculation results from a comparison of the price that the taxpayer charges for the items sold as compared to the cost paid for them. Whether using a direct or indirect methodology, the auditor often selects a representative test period, or sample period, for use in analyzing the purchases (generally selecting either a block sample or statistical sampling method). With a mark-on analysis, after selection of a sample/test period, the auditor "compares the cost of goods sold as developed from invoices and the records of suppliers to the menu prices, developing a ratio of cost to selling price for the test period . . . then arrives at an estimate of gross receipts . . . by applying that ratio to the cost of purchases" for each of the audit years. Charley O's, Inc. v. Dir., Div. of Taxation, 23 N.J. Tax 171, 176 (Tax 2006). If the auditor determines there is insufficient data to conduct a mark-on analysis, the auditor may instead complete an estimated assessment. The methodology is set out in the State of New Jersey, Dep't of the Treas., Div. of Tax'n, N.J. Manual of Audit Procedures, 58-59 (2022):

> When an auditor finds it necessary to prepare an estimated tax assessment (ETA), the following procedure is to be used to determine the amounts.
> The assessment shall be the higher of:
> • $2,000;
> • At least two times the estimated underpayment based on items being questioned or absent any information for the audit period; or • At least two times the highest liability of a comparable period within the past five years.
>
> If no information is available, then an estimate may be based on similar businesses or other external indices.

21

Ibid.

Taxation's assessments are entitled to a presumption of correctness. <u>Quest Diagnostic v. Dir., Div. of Taxation</u>, 21 N.J. Tax 484 (Tax 2004). "[T]he broad discretion allowed Taxation under N.J.S.A. 54:32B-19, and the presumptive correctness afforded its determinations, are based on the expectation that Taxation, as a governmental agency, will be reasonable in its initial determination that a taxpayer's books and records are inadequate." <u>Saulwil,</u> 31 N.J. Tax at 447 (internal citation omitted).

Once attached, a taxpayer may rebut the presumption through "cogent evidence that must be 'definite, positive and certain in quality and quantity to overcome the presumption.'" <u>Yilmaz</u>, 22 N.J. Tax at 233-4 (citation omitted). "Naked assertions" by the taxpayer are ineffective in rebutting the presumption. <u>TAS Lakewood v. Dir., Div. of Taxation</u>, 19 N.J. Tax 131, 140 (Tax 2000). Taxpayer's evidence must focus on the "reasonableness of the underlying data used by the Director and the reasonableness of the methodology used." <u>Yilmaz</u>, 22 N.J. Tax at 236 (internal citation omitted). "An 'aberrant' methodology will overcome the presumption of correctness. [ ] An imperfect methodology will not." <u>Ibid.</u> (citation omitted). <u>See</u> <u>Charley O's</u> (where auditor increased purchases by arbitrary amount the court found methodology to be aberrant "not merely imperfect.") 23 N.J. Tax at 186.

The court finds the following evidence is particularly relevant to the determination of whether Taxpayer's evidence is of a sufficient nature to overcome the presumption of correctness that attaches to the assessment. Both Taxpayer's expert and Intriago credibly testified that Taxpayer's purchase invoices were provided to the auditor. Thereby, they were available to him in deciding on the quality and sufficiency of the books and records. Regarding the reasonableness of the underlying data and methodology used by the auditor to estimate the assessment, Intriago credibly testified about the size of the pizzeria operating prior to January 2014, the number of employees at Taxpayer's business, and how those conditions differed from the auditor's description of the business during his September 2014 visit, observed after the date of the sale. Moreover, Taxpayer's expert produced evidence that his reconciliation of Taxpayer's books and records demonstrated that the Taxpayer had a tax obligation well below the amount of Taxation's estimated assessment. In sum, the court finds Taxpayer produced cogent evidence that is "definite, positive and certain in quality and quantity" directed at the reasonableness of the auditor's data and methodology. Yilmaz, 22 N.J. Tax at 233-4. The court finds the evidence calls into question the accuracy of the assessment sufficient to overcome the presumption of correctness.

The court next examines the law as it applies to Taxpayer's objections to Taxation's evidence. Thereafter, the court will review the entirety of the admissible

evidence to decide whether Taxpayer has, by a preponderance of the evidence, persuaded the court that the assessment in question should be reduced.

## II.    Lay Opinion Testimony

The New Jersey rules of evidence address two types of witness testimony, fact testimony, either in the form of lay testimony or lay opinion testimony (Evid. R. 602 and Evid. R. 701) and expert testimony (Evid. R. 702 and Evid. R. 703).  Under Evid. R. 602 "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ibid.  Personal knowledge also forms the foundation for testimony under Evid. R. 701, "Opinion Testimony of Lay Witnesses."  Lay witness opinion testimony is admissible "in the form of opinions or inferences" if the testimony "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." Ibid.

A witness who qualifies as an expert under the rule may testify in the form of opinion where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Evid. R. 702. "[E]xpert testimony is untethered to the constraints of personal knowledge and perception . . . [a]n expert may base an opinion or inferences on facts or data that are perceived by the expert or that are made known to the expert at or before the hearing. Evid. R. 703." E&H Steel Corp. v. PSEG Fossil, LLC., 455 N.J. Super. 12, 25 (App.

24

Div. 2018). Taxation's witness was never named as an expert for Taxation in pre-trial discovery, or at any time before trial. R. 4:10-2(d). Nor did Taxation proffer the witness as an expert at trial.

Taxation contends its witness has the requisite personal knowledge of the audit to support admission of her quasi-expert opinion testimony having supervised both the auditor and the auditor's direct supervisor.[10] Taxation relies on E&H Steel Corp., a breach of contract case, to support its position. 455 N.J. Super. at 12. The plaintiff there agreed to fabricate steel for equipment used at the defendant's power station. The bid price was based on the defendant's documents and specifications included in the bid package. Claims arose when the defendant made post-contract changes to the specifications with new drawings that required additional labor and cost resulting in disputed change orders. The plaintiff filed a construction lien and complaint for breach of contract followed by the defendant's counterclaim. The court conducted a Evid. R. 104 hearing to determine whether the plaintiff required an expert to establish a prima facie case. Id. at 18.

At the hearing the plaintiff proffered the testimony from a company vice-president. The witness had worked at E&H for more than 30 years including as a general laborer, shop employee, and fabricator, handling the fabrication process on

---

[10] The record lacks any testimony to explain what actions the witness took in supervising any of the auditor's supervisors as part of the subject audit process.

projects from start to finish, and acting as eventual engineering manager where he handled the review of drawings for change orders. Ibid. The witness testified about his direct involvement in the bid process for the disputed contract, describing in detail the fabrication process, pricing, and how he interpreted and analyzed the defendant's changes with specifications that differed materially from the bid drawings, requiring revisions and repricing. Id. at 19. The trial court found the testimony to be "very technical, extremely arcane, and very detailed" and necessary for the jury to hear. Id. at 21. Per the trial court, because of the technical nature of the testimony the court found that the witness had in fact provided expert testimony but denied the plaintiff's late designation of the witness as its expert. Id. at 22.

The appellate division agreed that the witness's testimony was "technical, arcane and involved specialized knowledge" but found "the nature of the testimony did not transform the engineer into an expert witness." Id. at 26. The court emphasized that "New Jersey law does not mandate that lay testimony, and even lay opinion testimony, based on scientific, technical or other specialized knowledge, automatically triggers the need for compliance with the rules for admissibility of expert testimony." Ibid. The appellate court found the witness's testimony at the hearing "related the factual details of the parties' interactions and described his own role in the events." Id. at 27. "His explanation of the bases for plaintiff's claims [along with documentary evidence admitted] . . . were integral parts of the parties'

26

business dealings, rather than litigation tools or after-the-fact analyses of the type that might be created by an expert specifically for trial." Ibid. Per the court, "any opinions expressed by [the witness] arose from his personal dealings with the project and knowledge of the field. Because the factual predicate of the testimony emanated from [his] personal perception, he was permitted to offer lay opinions." Ibid.

Taxation also relies on Cast Art Indus., LLC v. KPMG LLP, to support its position. 416 N.J. Super. 76, 100 (App. Div. 2010), rev'd on other grounds, 209 N.J. 208 (2012). In Cast Art, the plaintiff merged with a competitor, and later found the competitor had substantially overreported its revenue through faulty accounting practices. Id. at 97. After the merger the plaintiff's business failed, and it sued the competitor's accounting firm for damages. At trial the plaintiff presented the testimony of its president to establish that its business was profitable before the merger. Moreover, that reliance on the "cash crunch" caused by disparity of the competitor's actual receivables and what the plaintiff had expected, based on the competitor's audited pre-merger financial statements, was a substantial factor in the plaintiff's financial failure. Id. at 100. On appeal, the court rejected the defendant's argument that the plaintiff's president's testimony was insufficient and that an outside expert was required on the issue. Because the witness served as president both before and after the merger the appellate court found him to be "extremely knowledgeable about the giftware business generally and Cast Art's business

27

operations specifically." In sum, the court found that he was qualified to provide the testimony, no outside expert was needed. "A party to an action with expertise gained through such personal experience may express an opinion of the sort ordinarily provided by an expert." Ibid. Commenting on the extent of the witness's knowledge the court noted, "[i]ndeed, it is doubtful whether any outside expert could have obtained comparable knowledge of Cast Art's business operations and the cause or causes of its financial collapse after the merger." Ibid.

Taxation equates the witness's role as the auditor's supervisor with the personal knowledge that qualified lay opinion testimony in the cases it cites.[11] Taxpayer seeks to strike Taxation's witness's testimony in its entirety. Per Taxpayer, the witness did not perform the audit, prepare the report, or discuss the auditor's examination with him or ask how he reached his concluded estimates. She did not ask any questions of the auditor or his supervisors. She did not perform an in-depth review of the audit report and work papers; she did not review the purchase invoices or bank statements at the time of the audit; she did not know the basis for the auditor's estimated purchases of $250,000 used as the cost of goods sold; or the 3.5

---

[11] While Taxation relies as well on Navarro v. George Koch & Sons, 211 N.J. Super. 558 (App. Div. 1986), this court finds the case provides no support for Taxation's position because the appellate court there had no occasion to analyze the testimony of the witness. "Since the case is to be retried the precise basis for exclusion of [the company president's] testimony [in defending a product liability claim] may well be rendered moot at this juncture. However, we observe merely that such evidence does not always fall into the category of expert testimony." Id. at 582-3.

markup. Where the witness admitted that the auditor's estimates had no basis, she relied on her personal experience to justify her conclusions that the auditor's estimated figures were reasonable. The witness opined on the quality of both the purchase invoices and the bank statements of which she had no prior knowledge but which she examined for the first time at trial. Per Taxpayer, without knowledge of the audit, her personal experience should not qualify her to testify to what the auditor did here.

This court is unpersuaded by Taxation's argument and finds the witness lacks the requisite personal knowledge of and level of participation in the audit to provide the lay opinion testimony proffered. The witness did not observe Taxpayer's business directly, undertake her own review of any of Taxpayer's records, or discuss the audit with anyone who did. Her testimony is based on her general knowledge of audits and of audit reports pursuant to Taxation's audit manuals. The evidence supports the fact that the witness has personal knowledge of general audit procedures, including the audit of pizzerias, and could offer admissible witness testimony of that nature, but the witness was not offered for that purpose. Rather, Taxation proffered the witness to provide her opinion about the substance of Taxpayer's audit. To that end, Taxation's questions elicited inadmissible lay opinion testimony to support or corroborate the actions of the auditor and the estimated assessment. Her opinions were not rationally based on her personal perception of

29

the subject audit. Instead, they were derived from the witness's knowledge of prior audits. However, each audit differs with each standing on its own.

The witness candidly explained that her testimony was based on a reading of the auditor's report and work papers at trial, and the trial testimony of Taxpayer's witnesses. She did not actively participate in the audit. Instead, the witness served as a high-level supervisor assigned to review and sign off on the auditor's documents and send the case on to billing which role did not provide her with sufficient knowledge of the audit to opine on its results.

Absent the auditor to offer testimony about his re-examination of Taxpayer's additional documents or his basis for again rejecting Taxpayer's books and records as insufficient, Taxation was unable to proffer meaningful testimony from the trial witness on that issue. Notably, among the witness testimony, a substantial portion involved questions about Taxpayer's 2013 purchase invoices. Taxation questioned the witness at length about the purchase invoices, eliciting her opinion that the invoices were "incomplete" and "insufficient." In fact, the witness never saw the invoices prior to trial nor were the invoices part of the audit file reviewed by her. As noted, Taxpayer produced the documents at CAB by letter dated September 2015. By then the witness had completed her supervisory audit review and sent the assessment to billing, months earlier, in June 2015.

Unlike the witness, at the time the case was remanded to the auditor for re-examination, the auditor should have had in his possession Taxpayer's 2013 purchase invoices.[12] Per the CAB conference report, Taxpayer's production of the new information served as the basis for CAB to remand the case to audit. Yet, in the remand memo, the auditor never mentioned that he reviewed the newly supplied purchase invoices, documents the auditor had specifically requested in the initial IDR. The auditor omitted any analysis of the supplemental information, or rationale

---

[12] The expert's September 2015 letter to CAB included the documents. The records are also referenced as received in the CAB conference report, a document Taxation placed in evidence without objection, which reads, in pertinent part: "[t]he taxpayer hired a new representative who provided":

> -A confirmation from Jetro (Restaurant Depot) stating that the taxpayer made purchases of $58,547, $56,720, and $57,149, for the years 2011, 2012 and 2013, respectively. The supporting invoices were not provided.
> -17 purchase invoices from Performance Food Service (Roma) for 2013 totaling $13,744. The taxpayer purchased boxes, bags, cups, flour, tomato sauce, spices, oil, pepperoni and mozzarella and parmesan cheese.
> -A written rent statement from the landlord, Romana Romano, attesting that the taxpayer paid rent in cash monthly in the amount of $24,000, $24,600, and $25,200 for 2011, 2012 and 2013 respectively. The amounts were equal to the reported rent expense.
> -A worksheet illustrating the proposed gross receipts. Bank deposits were summarized for each year in the audit period and an additional amount was added for estimated cash receipts. The representative added $56,114, $61,907, and $47,328 for the years 2011, 2012 and 2013, respectively, stating that soda and pizza products were paid with cash."
> The case was remanded back to Audit for a re-examination in light of the new information. No changes were made.

to support the auditor's decision that he still found Taxpayer's books and records insufficient and continued the use of an indirect methodology.

Taxation likewise seeks to rely on the witness testimony as evidence that the data and methodology used by the auditor in setting the assessment were reasonable. However, per the witness's candid testimony, she was not testifying from personal knowledge of Taxpayer's documents or the auditor's actions, but rather she was "interpreting" the auditor's narrative.

If admitted, the witness's opinions could provide Taxation with proof to justify the auditor's actions in making an estimated assessment, as well as the reasonableness of the auditor's data and methodology and resulting estimated assessment. Such a ruling would permit Taxation to boot strap the proofs with improper testimony that constitutes nothing more than speculation. Saulwil, 31 N.J. Tax 433. It would frustrate the purpose of the rule and undermine the necessity for the limitations on lay opinion testimony. For those reasons, the court strikes Taxation's witness's testimony from the record.

III. Business Records (Evid. R. 803(c)(6) and Public Records (Evid. R. 803(c)(8))

Taxation contends that even without the witness testimony to support the auditor's actions, "the documents speak for themselves," and should properly be

32

admitted as exceptions to hearsay under Evid. R. 803(c)(6) and Evid. R. 803(c)(8).[13]

Taxpayer objects to the documents as inadmissible hearsay and untrustworthy. It argues the contents of the documents resulted from factual errors committed by the auditor that impact the validity of the assessment, suggesting for example, that the auditor erred in stating that Taxpayer's bank statements did not reflect any cash deposits, or cancelled checks for Taxpayer's purchases, and the auditor's failure to recognize the production of purchase invoices when Taxpayer admitted evidence to

---

[13] Evid. R. 803(c)(6), "Records of Regularly Conducted Activity" (Business Records) reads:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnosis, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.
> This exception does not apply if the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

Evid. R. 803(c)(8), "Public Records, Reports, and Findings, Subject to Rule 807," reads:

> (A) a statement contained in a writing or other record made by a public official of an act done by the official or an act, condition or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition or event reported and to make the written statement; or
> (B) statistical findings of a public official based upon a report of or an investigation of acts, conditions, or events, if it was within the scope of the official's duty to make such statistical findings. This exception does not apply if the sources of information or other circumstances indicate that such statistical findings are not trustworthy.

the contrary. Taxpayer highlights that the auditor visited the business premises in September 2014, after Intriago had sold his share of the business to Villa and San Gerardo Food Corporation. The conditions the auditor observed, including the number of employees and seating, differed from Taxpayer's.[14] Per Taxpayer, the auditor's errors necessitate a finding that neither rule should apply to admit the hearsay evidence. Per Taxation, any factual errors in the documents are a matter of their credibility rather than admissibility.

Taxation contends the auditor's report and work papers meet the threshold standard under the rules and thereby attain a "circumstantial probability of trustworthiness." State v. Matulewicz, 101 N.J. 27, 29-30 (1985). In addition, Taxation relies on the Court's language addressing the Public Records rule where the Court reiterated "the view expressed in variant contexts recogni[zes] '[t]here is a presumption, absent contrary testimony, that those responsible for services to the public will carry out their duties in a proper, careful and prudent manner.'" Id. at 31 (internal citation omitted).

In considering application of the two rules, this court finds under Evid. R. 803(c)(6) the threshold requirements have been met (record of an act, in writing,

---

[14] The auditor referenced the employee information in the section of the report related to the GIT-ER assessment. In the section of the report titled "Unusual Circumstances" the auditor referenced the number of employees and the amount of seating he observed at the September 2014 visit and cross-referenced same in the section on the SUT assessment. The auditor's report also made note of his observations regarding the menu items offered for sale at that pizzeria.

made by one with actual knowledge, in the regular course of business/regular practice of that business to make the writing, prepared at or near the time of observation). As to Evid. R. 803(c)(8), the court likewise finds the threshold requirements have been met (statement in writing, of act observed by a public official acting within the scope of official duty). However, that does not end the court's inquiry. The rules and case law make clear, reliability is the lynchpin to the admission of documents otherwise excluded by hearsay under these rules. Matulewicz, 101 N.J. 27. Records that meet the rules' threshold requirements attain a "circumstantial probability of trustworthiness," but "general acceptance of reliability will not attach if 'the trial court, after examining them . . . and hearing the manner of their preparation explained, entertains serious doubt as to whether they are dependable or worthy of confidence.'" Id. at 29-30 (internal citation omitted). "[T]he source of the information and the method and circumstances of the preparation of the writing must justify allowing it into evidence." Id. at 29 (internal citation omitted). The Supreme Court remanded the Matulewicz case to the trial court to develop a record of the "quality and nature" of the forensic chemist report at issue. Id. at 32.

In this case, the court has serious concerns over the quality and manner of the auditor's methodology as well as the underlying data collected during the audit examination of Taxpayer's business. As to the methodology utilized, the auditor

failed to describe what in fact he did to determine the estimated assessment. Moreover, the audit report and work papers contain figures for the auditor's concluded cost of goods sold (COGS) and an estimated mark-on but omit any analysis to describe how the auditor reached those estimates.

The evidence also reveals a fatal flaw in the underlying audit data. The auditor relied on information he obtained during a September 2014 visit to the wrong business. La Troncal and Intriago sold the business nine months earlier in January 2014. That data collected and contained in the audit report as it relates to the auditor's estimated assessment, had no application to Taxpayer's business. The data was collected from the wrong Taxpayer. The court is unable to parse the data in the report absent an explanation of the steps the auditor followed, and how the auditor used the information to arrive at the assessment. Thereby, the court has no ability to determine the extent to which the data affected the accuracy of the assessment. Moreover, the period of the sales tax audit extended through March 2014 resulting in an assessment that covered a period when La Troncal was no longer operating. Those facts are undisputed.

Under the Business Records rule, and the precedential case law, the method and circumstances surrounding the preparation of the writing must justify allowing the hearsay statements into evidence. Matulewicz, 101 N.J. 27; Evid. R. 803(c)(6) (Per the rule, "This exception does not apply if the sources of information or the

method, purpose or circumstances of preparation indicate that it is not trustworthy.") The evidence here raises serious concerns about the auditor's methodology and the unreliable nature of the data used in setting the assessment. As a result, this court finds the documents are not trustworthy and will not be admitted into evidence under Evid. R. 803(c)(6) as an exception to hearsay. The same analysis underlies this court's consideration of the Public Record exception to the hearsay rule, under Evid. R. 803(c)(8). Based on the record, the court is unable to conclude that the auditor did his duty in a "proper, careful and prudent manner" to admit the documents as exceptions to hearsay under the rule. Matulewicz, 101 N.J. at 31.

Based on all the relevant and admissible evidence as set forth above, the court finds the methodology used to set the assessment is aberrant given the auditor's unexplained methodology and the collection and use of unreliable data wholly irrelevant to Taxpayer's business. The court finds no basis on which to uphold the validity of the assessment and sets it aside.

Despite that result, the relevant evidence shows that Taxpayer is still liable albeit for some taxes based on its expert's analysis, which this court finds credible. The expert explained how he reconciled Taxpayer's purchase and expense information, bank statements and tax returns, to conclude under-reported differences in the sales tax that La Troncal reported in the total amount of $416,847. The expert concluded that Taxpayer owes sales tax over the amount remitted, of $29,179

($416,847 x 7%).  The expert likewise concluded an under-reported difference in CBT tax in the amount of $35,757.  The expert concluded that Taxpayer owes CBT tax over the amount remitted, of $5,365 ($35,757 x 15%).  The expert concluded the total tax owed is $34,544.   Although Taxation offered effective cross examination of Taxpayer's witnesses, the court finds both Intriago's testimony and the expert's testimony to be credible.

The court finds that the expert's conclusions were based on sufficient credible evidence to support his concluded CBT and S&U tax liability.  Taxpayer has met its burden of persuasion by a preponderance of the evidence as to those taxes.  Notably, litter tax was omitted from the expert's reconciliation.  Pursuant to R. 8:9-3, counsel shall provide the court with a calculation of the total tax due, including any applicable interest and penalties, and any litter tax computation, within twenty days of the date of this opinion, for the entry of judgment.